IN THE SUPREME COURT OF TENNESSEE
AT KNOXVILLE
September 3, 2008 Session

## STATE OF TENNESSEE v. DAVID HAROLD HANSON

**Appeal by Permission from the Court of Criminal Appeals**
**Criminal Court for Anderson County**
**No. A4CR0208     James B. Scott, Jr., Judge**

---

**No. E2006-00883-SC-R11-CD - Filed February 23, 2009**

---

The defendant, charged with two counts of aggravated child abuse, was convicted only upon the second count. While upholding the propriety of the jury instructions, the Court of Criminal Appeals reversed, ruling that the state had failed to establish that the defendant had knowingly inflicted the injuries. We granted review in order to determine whether the evidence was sufficient to establish that the defendant acted knowingly and by non-accidental means. Because the trial court provided adequate instructions and because the circumstantial evidence, as accredited by the jury, established the essential elements of the offense, the judgment of the Court of Criminal Appeals is reversed and the conviction and sentence is reinstated.

**Tenn. R. App. P. 11; Judgment of the Court of Criminal Appeals Reversed**

GARY R. WADE, J., delivered the opinion of the court, in which JANICE M. HOLDER, C.J., WILLIAM M. BARKER, CORNELIA A. CLARK, and WILLIAM C. KOCH, JR., JJ., joined.

J. Thomas Marshall, Jr., District Public Defender, Clinton, Tennessee, for the appellee, David Harold Hanson.

Robert E. Cooper, Jr., Attorney General & Reporter; Michael E. Moore, Solicitor General; Leslie E. Price, Assistant Attorney General; Dave Clark, District Attorney General; and Jan Hicks, Assistant District Attorney General, for the appellant, State of Tennessee.

### OPINION

#### Factual and Procedural Background

On May 22, 2003, Amanda Silcox ("Silcox") gave birth to a daughter, S.H.,[1] who was

---

[1] The infant victim was given a new name by her adoptive parents. She is no longer known by the name given her by Silcox and the Defendant. Nevertheless, we will refrain from using either her given or adoptive name in the text of this opinion.

fathered by her boyfriend, David Harold Hanson (the "Defendant"). The couple shared a residence in Oak Ridge. Less than two months later, on the evening of July 13, the Defendant and Silcox brought S.H. to the emergency room of Children's Hospital in Knoxville ("Children's Hospital"). At the time, S.H. exhibited significant swelling and discoloration in her right leg. After x-rays and an examination, S.H.'s leg was placed in a splint and she was released, and Silcox and the Defendant were instructed to follow-up with their pediatrician. A series of examinations ensued, by both the pediatrician, Dr. C. Timothy Morris, and Children's Hospital. Dr. Morris, acting upon the request of a hospital physician, directed Silcox to Children's Hospital to obtain a full-body, skeletal survey x-ray of S.H. The survey indicated that S.H. suffered from not only two fractures above her swollen right ankle, but also thirteen other fractures, apparently incurred in at least two separate incidents. There were four "corner" fractures in her right leg and two "corner" fractures in her left leg, all of which appeared to have occurred within twenty-four to forty-eight hours of her first hospital visit. S.H. also had nine separate rib fractures, which appeared to be older injuries.

On June 1, 2004, the Defendant was charged with two counts of aggravated child abuse under Tennessee Code Annotated section 39-15-402 (Supp. 2002)[2] – one count arising from the rib injuries ("Count I") and a second count arising from the leg injuries ("Count II"). Over the course of the four-day guilt phase of the Defendant's trial, the State established that the Defendant had physical custody of S.H. on July 13, 2003, the date she was first taken to the hospital for treatment. Other evidence presented by the State included the Defendant's out-of-court explanation of S.H.'s injuries and the testimony of five different physicians as to the nature and likely causes of S.H.'s injuries. The Defendant, who elected not to testify, offered no proof in rebuttal. The jury returned a unanimous verdict, acquitting the Defendant of Count I but convicting him of Count II. The trial court imposed a sentence of eighteen years.

In his direct appeal to the Court of Criminal Appeals, the Defendant contended that the evidence presented at trial was insufficient to support his conviction. He also challenged the propriety of portions of the jury instructions. A majority of the Court of Criminal Appeals reversed

---

[2] Tennessee Code Annotated section 39-15-402 defines aggravated child abuse in relation to the definition of child abuse in Tennessee Code Annotated section 39-15-401 (Supp. 2002). Section 39-15-401(a) provides:

Any person who knowingly, other than by accidental means, treats a child under eighteen (18) years of age in such a manner as to inflict injury or neglects such a child so as to adversely affect the child's health and welfare commits a Class A misdemeanor; provided, however, that if the abused or neglected child is six (6) years of age or less, the penalty is a Class D felony.

Tennessee Code Annotated section 39-15-402 provides, in relevant part:

(a) A person commits the offense of aggravated child abuse or aggravated child neglect who commits the offense of child abuse or neglect as defined in § 39-15-401 and:
    (1) The act of abuse or neglect results in serious bodily injury to the child; or
    (2) A deadly weapon is used to accomplish the act of abuse.
(b) A violation of this section is a Class B felony; provided, however, that, if the abused or neglected child is six (6) years of age or less, the penalty is a Class A felony.

and dismissed the conviction, holding that the evidence was insufficient to establish that the Defendant acted knowingly and by non-accidental means:

> Other than proof that the defendant fell on S.H. while walking on the stairs, the state did not present evidence at trial which would have allowed the jury to find that S.H.'s fractures were caused by the *knowing conduct of the defendant*. While we in no wise discount the fact that the state presented evidence that S.H. sustained injuries consistent with abuse, absent proof that the defendant knowingly treated S.H. in an abusive manner, the defendant's conviction cannot stand. The statute requires that the act of treating a child in an abusive manner *must be knowing conduct*.

State v. Hanson, No. E2006-00883-CCA-R3-CD, 2007 WL 2416103, at *8 (Tenn. Crim. App. Aug. 27, 2007). The majority did, however, conclude "that sufficient medical evidence was presented at trial for the jury to find that S.H. experienced extreme physical pain as a result of the fractures to her legs and therefore suffered serious bodily injury." Id. at *9. Thus, had the requisite *mens rea* been satisfactorily established by the proof, our intermediate appellate court would have held that the injury qualified as serious enough to establish aggravated child abuse as opposed to the lesser offense of child abuse. Tenn. Code Ann. §§ 39-15-401 to 402. Judge Robert W. Wedemeyer dissented. While acknowledging that the State had no direct evidence of the Defendant's state of mind, he believed that the "surrounding circumstances" permitted the jury, as the finder of fact, to infer that the Defendant knowingly, rather than accidentally, inflicted the injuries on the child victim. Hanson, 2007 WL 2416103, at *13-14 (Wedemeyer, J., dissenting). Because the primary question for our review is whether the evidence offered at trial is sufficient to support the conviction of aggravated child abuse, we have provided a summary of the testimony of each witness.

**Testimony of Amanda Silcox**

Amanda Silcox testified that S.H. was born at the Fort Sanders Regional Medical Center ("Fort Sanders") in Knoxville approximately a year after she and the Defendant began living together in Oak Ridge. The Defendant worked intermittently at a Sonic restaurant, quitting and then returning to his job on multiple occasions over the term of his relationship with Silcox. During her pregnancy, Silcox also worked at Sonic, leaving her job only shortly before the birth of her child.

During her stay at Fort Sanders, Silcox was provided with basic instructions for the care of her infant. She confirmed, for example, that both she and the Defendant knew to hold S.H. in such a way as to support her head and body.

In early July, Silcox went back to work at Sonic. For the first few days, when both she and the Defendant were employed there, her mother cared for S.H. On the fourth day, however, the Defendant, without notifying Silcox of his intentions to do so, again quit his job. Thereafter, he undertook the duty of caring for S.H. during Silcox's absence.

On July 13, 2003, the couple lived in a residential neighborhood less than five minutes from the Oak Ridge Methodist Medical Center ("Methodist"). Silcox drove the couple's car to work,

leaving the Defendant home alone with S.H. and without transportation. When Silcox returned from work at approximately six or seven that evening, the Defendant hugged her and tearfully explained that he had fallen with S.H. while carrying some laundry up the staircase. The two decided to take S.H. to Children's Hospital, despite the close proximity of Methodist, explaining that they preferred a hospital specializing in children, not because they feared the Methodist health providers would contact Oak Ridge law enforcement. Silcox also implied that her family members had encountered difficulties with Methodist on prior occasions. When asked if she called ahead to Children's Hospital, Silcox replied that she did not have a telephone at the time.

Silcox described S.H.'s right leg as "swollen and bluish-purple," and recalled that S.H. cried when a physician at Children's Hospital examined her. Doctors placed a splint on S.H.'s right leg, discharged her, and instructed Silcox and the Defendant to follow up with their pediatrician, Dr. Morris, in two to three days.[3]

Silcox saw Dr. Morris two days later. The Defendant was present. Although the swelling was reduced, S.H.'s right leg was still swollen and discolored. Dr. Morris directed the couple to immediately return to Children's Hospital for additional x-rays. There, the treating physicians authorized further x-rays and scheduled an appointment with orthopaedic surgeon Dr. Mark Turner for the following day. Dr. Turner ordered more x-rays and instructed Silcox to follow up with Dr. Morris.

On July 24, 2003, eleven days after she first reported the leg injury, Silcox again took S.H. to see Dr. Morris, with whom she had already scheduled a routine two-month check up. After Dr. Morris removed S.H.'s splint and observed her foot, he directed Silcox to take S.H. back to Children's Hospital for a full-body, skeletal x-ray. Silcox complied, and, afterwards, S.H. was admitted to the hospital. On the same day, Silcox gave a written statement to Detective Ron Boucher of the Oak Ridge Police Department, who had initiated an investigation for possible child abuse. Her explanation of the events to Detective Boucher was as follows:

> David said he . . . fell on the steps with [S.H.]. He said he went downstairs to get the laundry and took her with him. He then carried her in one arm and the basket in the other. He said he started up the stairs and tripped on the steps and fell face first and landed on top of her. He said when he fell her right leg bent back. He then took her on upstairs and fed and changed her. He said she acted fine and went to sleep. He also said that she slept for a while [and] then woke up and . . . he then noticed the bruises on her leg.

As a part of her statement to the police, Silcox claimed that she had never hurt S.H. and had never suspected the Defendant of any wrongdoing.

---

[3] Although x-rays were taken pursuant to this visit, the treating physicians were unable to identify any fractures to the ankle at that time. See discussion of physician witness testimony infra.

In August of 2003, Silcox was again questioned by police, this time by Knoxville Police Department investigator Gary Anders. When asked at trial if she had informed Anders during his interrogation that the Defendant had tossed S.H. into the air, Silcox replied that she had no recollection of using those words. She did recall a prior occasion when the Defendant held S.H. in the air, but she contended that he did not throw her or let her go. When asked if she remembered telling the prosecution just prior to the trial that the Defendant had, in fact, "put her up in the air just a little bit and caught her," she admitted having made the statement, but explained that "what I meant was put her up in the air but didn't take his hands off of her and then just brought her back down." When pressed, Silcox replied, "I didn't actually mean – it may have come out that way. I understand that."

Silcox acknowledged during her testimony that she still lived with the Defendant and continued to be romantically involved with him. She stated that her purpose in testifying was to help him. Silcox admitted that after S.H. was hospitalized and then taken into Department of Children's Services custody, she understood that she had to make a choice between S.H. and the Defendant. She acknowledged that she had chosen to maintain her relationship with the Defendant.

### Testimony of Gary Anders

Gary Anders, an investigator from the Knoxville Police Department, testified that Silcox had made statements during his interview that contradicted her testimony at trial. He recalled that she had specifically informed him that "she saw [the Defendant] . . . throw [S.H.] up in the air [twice] and catch her on the way down, and he may have grabbed her too hard and possibly caused the impact [to the ribs]." Although he did take notes at the time, Anders admitted that he did not record the interview. He did not question Silcox about any possible causes of the leg injuries.

### Testimony of Detective Ron Boucher

Detective Ron Boucher, who was alerted to S.H.'s situation eleven days after the first report of her injuries, traveled to Children's Hospital, where he took a photograph of her swollen and discolored right leg that was admitted as an exhibit at trial. After interviewing Silcox, he asked her to inform the Defendant that he wished to question him as well. On the following day, he questioned the Defendant at the Oak Ridge Police Department.

The Defendant informed Detective Boucher that he was walking upstairs with a laundry basket in his right hand and S.H. in his left hand when he fell, landing on her. He acknowledged that none of his friends or family members caused S.H.'s injuries. When asked what could have caused the injuries other than those to the right leg, the Defendant did not answer. The interview was not recorded, and the Defendant declined the Detective's request to make a written statement.

Several times after the initial interview, Detective Boucher went to the Defendant's residence to further investigate. Despite the fact that he went at different times during the day and "a couple" of the times a vehicle was at the residence, he never received an answer when he knocked at the door.

**Testimony of Dr. Sidney Roberts**

Dr. Sidney Roberts, a staff radiologist at Children's Hospital specializing in pediatrics, testified that he reviewed the initial x-rays of S.H.'s right ankle on the day following the first report of her injury. At that time, Dr. Roberts could not find any fractures on the ankle. When S.H. was brought back for additional x-rays two days after her first examination, Dr. Roberts examined S.H. and more x-rays of the right ankle were performed. Dr. Roberts described the ankle as "very swollen[, t]wo or three times the size of the opposite leg . . . ." He indicated that the ankle was "quite both red and bruised looking." In the second x-rays, Dr. Roberts discovered "small fractures of the corner of the two bones in the lower leg." Dr. Roberts explained that the fractures were visible in the second x-rays because S.H.'s bones had begun to calcify as part of the natural healing process. After discovering the fractures, Dr. Roberts called Dr. Morris to inform him that the location and appearance of the fractures were "suspicious for child abuse or non-accidental injury."

When Dr. Roberts read the medical history, he learned that the Defendant claimed to have "fallen down the steps with the child." It was his opinion, however, that the fractures were not consistent with a fall. He testified that the fractures were instead consistent only with "either twisting or a traction injury, pulling." He explained that a fall would typically be expected to "create a fracture of a long bone in the shaft."

Dr. Roberts, who also reviewed the full-body, skeletal survey x-rays, taken eleven days after the report of the injury, and found additional corner fractures in the cartilage and bones below S.H.'s right knee, for a total of four distinct fractures in the right leg. He also observed two corner fractures at the ankle in S.H.'s left leg, which were similar to the ankle fractures in her right leg. It was his opinion that all six leg fractures were the result of non-accidental child abuse, having occurred within "24-to-48 hours" of July 13. Dr. Roberts further explained that S.H.'s x-rays were not consistent with "brittle bone" disease, which would have rendered her especially susceptible to fractures, because the amount of calcium in S.H.'s bones was normal. He testified that S.H.'s bones did not show bowing or irregularity of the cartilage surfaces associated with such a condition.

During cross-examination, Dr. Roberts conceded that it was at least possible for S.H.'s ankle to have been fractured if her leg had been twisted while she was fallen upon by an adult. He explained, however, that even if it was possible that such a fracture of one leg might result from twisting during a fall, he saw no possible way that "it could happen with both legs." He also conceded that it was possible, although unlikely, that the leg fractures could have been the result of someone dropping S.H. and catching her by both legs, but only "if it was a severe jerk." It was also his opinion that simply picking S.H. up by her legs would not have caused the fractures. He maintained, however, that such fractures could occur when an individual simultaneously "pulled both legs" with "enough force." Dr. Roberts also testified that the leg fractures could not have been caused by shaking and described them as particularly painful over a prolonged period of time. It was his opinion that the pain would be continuous and last "several days" and possibly "weeks."

Dr. Roberts also opined that the rib fractures, which had occurred three to five weeks prior to the full body survey, were the result of "a squeezing motion with adult hands" of "considerable

force." It was his belief that fractures of that nature would not arise from the normal handling of an infant.

### Testimony of Dr. Mark Turner

Dr. Turner, the orthopaedic surgeon who saw S.H. at Children's Hospital three days after the first report of injury, did not initially see any fractures on either the x-rays taken earlier at Children's Hospital or his own x-rays. Because, however, the right leg was so swollen, he decided to treat it as if there had been a fracture.

Two weeks later, after reviewing S.H.'s full-body, skeletal survey x-rays, Dr. Turner agreed with Dr. Roberts' diagnosis – four fractures on the right leg, two on the left leg, and nine on the ribs. It was his opinion that the fractures were the consequence of "non-accidental trauma."

### Testimony of Dr. C. Timothy Morris

Dr. Morris, S.H.'s pediatrician, had treated her several times before the first report of her injuries. He testified that when he saw her in his office two days after the leg injury, S.H. had a splint on her right foot. According to Dr. Morris, "the baby cried vociferously" at the least movement of her leg. Because the fracture or fractures may not have been visible in the initial x-ray, and because of S.H.'s "distinct, distinct pain reaction," Dr. Morris recalled instructing Silcox to take S.H. back to Children's Hospital for new x-rays.

Dr. Morris stated that he saw S.H. again nine days later for a previously scheduled check-up, discovering that her right leg was more purple and brown than it had been the prior week. While S.H. still indicated pain in her leg, the pain response appeared to have lessened and some swelling had subsided. A series of Polaroid photographs of S.H.'s legs taken by Dr. Morris depicted the discoloration and swelling of the leg and were made exhibits at trial. The left leg, which was also photographed, indicated neither discoloration nor readily identifiable swelling. Upon the recommendation of Dr. Roberts, Dr. Morris instructed Silcox to take S.H. to Children's Hospital for the full-body x-rays.

Based on his examination, the results of the x-rays, and his consideration of the medical reports from Children's Hospital, Dr. Morris concluded that S.H. had been the victim of abuse. On cross-examination, he conceded that his definition of child abuse included negligent behavior, and acknowledged that there was a "gray zone" as to whether it would include accidental behavior. He also testified that the term "reasonable degree of medical certainty," as he applied it, meant "more probable than not."

### Testimony of Dr. Lori Nunley

Dr. Lori Nunley, a pediatric emergency room physician at Children's Hospital, saw S.H. shortly after the full-body x-rays. She described S.H.'s "right lower leg [as] very swollen" and observed "pink, purple, purple-blue" bruising. There was also evidence of bruising on the sole of S.H.'s right foot, especially on her great toe, and S.H.'s left lower leg was tender to the touch. Dr. Nunley admitted that it was very difficult to measure pain in a two-month-old child. It was her

opinion, however, that fractures of the type S.H. received would cause extreme pain with normal movement.

After studying the x-rays, Dr. Nunley, like the other doctors, identified six leg fractures – four on the right leg and two on the left leg – and nine rib fractures. She testified that the leg fractures were corner or "bucket-handle" types, which "are considered to be exclusively [the result of] child abuse." It was her opinion that the fractures were caused by "extreme torque-ing action," "extreme rotation motion," or the result of S.H. being "flail[ed] back and forth violently . . . ." Because the fractures occurred on both sides of the bone, it was her conclusion that the fractures would have to be the result of "a hard torque or a rapid flail" rather than, as Dr. Roberts had suggested as one possibility, a "yank[ing]" action. In partial contradiction of Dr. Roberts' testimony, Dr. Nunley opined that corner fractures could be the result of violent shaking, but she also pointed out that a subsequent evaluation by an ophthalmologist indicated an absence of retinal hemorrhages in S.H., which are typically associated with shaken infants.

Dr. Nunley specifically observed that the fractures were not consistent with someone falling down when carrying the baby, even if the adult fell on top of the baby. She described the leg fractures as "absolutely not" the result of an adult lifting S.H.'s legs when changing her diaper. When asked if the fractures could have been caused by an adult picking S.H. up by her legs, Dr. Nunley replied that only "forceful twisting" accompanied by the lifting of the child could produce such a result. She stated that the pattern of fractures did not suggest brittle bone disease. Her diagnosis was that S.H. was physically abused.

Dr. Nunley echoed Dr. Roberts' conclusion as to the cause of S.H.'s rib fractures, stating that an adult squeezing with "a lot of force" was "the only [plausible] explanation." Dr. Nunley found a small, fading bruise on S.H.'s chest, roughly "the size of a pinky fingernail"; however, she found no indication of pain from the chest.

**Testimony of Dr. Mary Campbell**
Dr. Mary Campbell, who holds board certifications in both pediatric emergency medicine and pediatrics, provides specialty consultations on child abuse at Children's Hospital in addition to her duties providing pediatric and pediatric emergency care. She had previously testified on a number of occasions – "generally two or three times a month" – on pediatric medicine issues in litigation involving possible child abuse. Dr. Campbell saw S.H. on July 25 at the request of Dr. Nunley, some twelve days after the first report of her injury. When Dr. Campbell examined S.H., she found the same injuries noted by other doctors, specifically swelling and bruising of her lower right leg and a single bruise on her chest wall. Upon reviewing the medical history provided by Drs. Morris and Nunley, Dr. Campbell found no signs of other medical problems that might explain the injuries. She confirmed that there was no evidence or family history of "brittle bone" disease. It was Dr. Campbell's opinion that a fall of the nature described by the Defendant might have accounted for injuries to S.H.'s right foot and the lower portion of her right leg, but she stated that a fall of that nature would not account for the higher corner fractures near the knee.

For a variety of reasons, Dr. Campbell concluded that S.H. suffered from "inflicted trauma." She pointed out that there were multiple fractures and also concluded that the fractures appeared to be the result of "a very impressive amount of force" – enough that "[t]here was concern for dislocation of the foot." Dr. Campbell also concluded that a variety of other factors, such as the delay between the injury and the first medical treatment and the nature of the rib and "bucket-handle" corner fractures in the legs, supported her conclusion that S.H. had been abused. Dr. Campbell also testified that it was "very evident in every examiner's notes" that S.H. had pain in her right leg, and that the leg was "especially . . . painful" over a period of one to two weeks.

### Additional Testimony and Evidence

Pam Silcox, the mother of Amanda Silcox, testified that she took care of S.H. for the two or three days before the Defendant undertook that responsibility. She confirmed that S.H. was not involved in any kind of accident while under her care and testified that she first learned of S.H.'s injuries when her daughter, emotional and crying, telephoned her from the Children's Hospital emergency room on July 13, 2003.

S.H.'s adoptive mother, who testified under the pseudonym "Mrs. Foster," testified that she and her husband took physical custody of S.H. after her release from Children's Hospital. She stated that S.H. would cry in a distinctive manner when her legs were handled during diaper changing. She described her cry as indicating pain, which was markedly distinguishable from her crying when she was hungry or tired.

Dr. Roberts made a diagram of the fractures, indicating the location of each, and the diagram was marked as an exhibit. X-rays were also presented as evidence.

### Standard of Review

"When considering a sufficiency of the evidence question on appeal, the State must be afforded the strongest legitimate view of the evidence and all reasonable inferences that may be drawn therefrom." State v. Vasques, 221 S.W.3d 514, 521 (Tenn. 2007). "The credibility of the witnesses, the weight to be given their testimony, and the reconciliation of conflicts in the proof are matters entrusted to the jury as the trier of fact." State v. Campbell, 245 S.W.3d 331, 335 (Tenn. 2008) (citing Byrge v. State, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978)). When the sufficiency of the evidence is challenged, the relevant question is whether, after reviewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. See Tenn. R. App. P. 13(e); Jackson v. Virginia, 443 U.S. 307, 319 (1979). Because a verdict of guilt removes the presumption of innocence and raises a presumption of guilt, the criminal defendant bears the burden on appeal of showing that the evidence was legally insufficient to sustain a guilty verdict. State v. Evans, 838 S.W.2d 185, 191 (Tenn.1992). "This standard is the same whether the conviction is based upon direct or circumstantial evidence." State v. Sutton, 166 S.W.3d 686, 689 (Tenn. 2005); see also State v. Brown, 551 S.W.2d 329, 330 (Tenn. 1977).

In the absence of direct evidence, a criminal offense may be established exclusively by

circumstantial evidence. Duchac v. State, 505 S.W.2d 237, 241 (Tenn.1973); Marable v. State, 313 S.W.2d 451, 456-58 (Tenn. 1958). If entirely circumstantial, the facts and circumstances must "be so strong and cogent as to exclude every other reasonable hypothesis save the guilt of the defendant." State v. Crawford, 470 S.W.2d 610, 612 (Tenn. 1971). "The jury decides the weight to be given to circumstantial evidence, and '[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury.'" State v. Rice, 184 S.W.3d 646, 662 (Tenn. 2006) (quoting Marable, 313 S.W.2d at 457 (citations omitted)).[4] The court may not substitute its inferences for those drawn by the trier of fact in circumstantial evidence cases. Liakas v. State, 286 S.W.2d 856, 859 (Tenn. 1956).

## Analysis
## Sufficiency of Evidence of Knowledge and Lack of Accident

The Defendant argues that the evidence was insufficient for any rational jury to conclude beyond a reasonable doubt that the Defendant inflicted S.H.'s leg injuries "knowingly, other than by accidental means." As of the date of S.H.'s injuries, Tennessee Code Annotated section 39-15-401(a) defined child abuse as follows:

> Any person who knowingly, other than by accidental means, treats a child under eighteen (18) years of age in such a manner as to inflict injury . . . commits a Class A misdemeanor; provided, however, that, if the abused . . . child is six (6) years of age or less, the penalty is a Class D felony.

Child abuse may be aggravated when the abuse either "results in serious bodily injury to the child" or is accompanied by the use of a deadly weapon. Tenn. Code Ann. § 39-15-402(a)(1)-(2). Aggravated child abuse is either a Class A or B felony depending upon the age of the victim. Tenn. Code Ann. § 39-15-402(b).

The term "knowing" refers to one of four culpable mental states – *mens rea* – adopted by the

---

[4] Years ago, Special Justice Erby Lee Jenkins wrote eloquently on behalf of this Court, admonishing the finder of fact to exercise caution in prosecutions based entirely upon circumstantial evidence:

> In order to convict on circumstantial evidence alone, the facts and circumstances must be so closely interwoven and connected that the finger of guilt is pointed unerringly at the defendant and the defendant alone. A web of guilt must be woven around the defendant from which he cannot escape and from which facts and circumstances the jury could draw no other reasonable inference save the guilt of the defendant beyond a reasonable doubt. Mere suspicion and straws in the wind are not enough for circumstances take strange forms. Under our form of government and the administration of criminal justice, the defendant is clothed with a mantle of innocence and that presumption of innocence hovers over and protects him throughout the trial. Until this is overturned by strong proof of his guilt beyond a reasonable doubt, not an imaginary or captious doubt but an honest doubt engendered after a consideration of all the evidence so that the minds of the jurors cannot rest easy as to the certainty of guilt, he is entitled to an acquittal.

Crawford, 470 S.W.2d at 613.

General Assembly for use throughout the state's criminal code. See Tenn. Code Ann. § 39-11-302 (1997); State v. Page, 81 S.W.3d 781, 786 (Tenn. Crim. App. 2002) ("There are four culpable mental states in Tennessee: intentional, knowing, reckless and criminal negligence."). The General Assembly has defined "knowing" as follows:

> "Knowing" refers to a person who acts knowingly with respect to the conduct or to circumstances surrounding the conduct when the person is aware of the nature of the conduct or that the circumstances exist. A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result.

Tenn. Code Ann. § 39-11-302(b). This definition contemplates that the term "knowing" may be applied to three distinct types of statutorily-defined conduct – or the *actus reus*: (1) the nature of the defendant's conduct, (2) the circumstances surrounding the defendant's conduct, and (3) the result of the defendant's conduct. See Page, 81 S.W.3d at 787.

When applying statutory *mens rea* elements, we have acknowledged the distinction between "nature-of-conduct" and "result-of-conduct" offenses. Whereas a nature-of-conduct offense "seeks principally to proscribe the nature of the . . . conduct, as opposed to the result that the defendant's conduct achieves," State v. Mateyko, 53 S.W.3d 666, 673 (Tenn. 2001), "the *mens rea* required for [a result-of-conduct] offense accompanies only its resulting harm . . . ." State v. Ely, 48 S.W.3d 710, 728 (Tenn. 2001). "The focus is on whether the actor possessed the required culpability to effectuate the result that the legislature has specified. Generally, an offense may be classified as a result-of-conduct offense when the result of the conduct is the only element contained in the offense." State v. Ducker, 27 S.W.3d 889, 896 (Tenn. 2000).

In Ducker, we specifically addressed whether aggravated child abuse qualified as a nature-of-conduct or a result-of-conduct offense. Jennie Bain Ducker had left her two children, ages twenty-three months and twelve months, strapped into car seats and locked in her car for over eight hours on a late spring day. The children died of "systemic hyperthermia, a condition that results when a human body severely overheats and is unable to cool itself." Id. at 892. Ducker, indicted upon two counts of first degree murder but convicted of two counts of aggravated child abuse, appealed, arguing that the evidence was insufficient to show that she knew that her conduct would result in serious bodily injury to her children. We concluded that aggravated child abuse qualified as a nature-of-conduct offense:

> Accordingly, [Tennessee Code Annotated section 39-15-401] requires that the act of treating a child in an abusive manner or neglecting the child must be knowing conduct. For instance, the defendant must have knowingly left or abandoned her children in the car for more than eight hours. If the defendant had been unaware that her children were present in the car when she left her car parked in front of the hotel, the neglect of her children would have been accidental or unknowing. . . .

Once the knowing mens rea is established, the next inquiry under the plain language of the statute is simply whether the child sustained an injury or, in the case of child neglect, whether the child suffered an adverse effect to the child's health or welfare. The legislature has employed the phrases "so as to injure" and "so as to adversely affect" when defining the injury aspect of the child abuse statute. These phrases clearly indicate that if an injury results from knowing abuse or neglect, the actor has committed child abuse. . . .

We, therefore, . . . hold that the mens rea of "knowing" refers only to the conduct elements of treatment or neglect of a child under the child abuse statute and conclude that the child abuse offenses are not result-of-conduct offenses.

Id. at 897. The phrase "other than by accidental means" in the statute modifies the *actus reus* of the crime, and does not alter the accepted meaning of "knowing." Id. Thus, because the record established "that [Ducker] knowingly parked her car, rolled up the windows, securely fastened the children in [their seats], locked the car and left them inside . . . from approximately 3:45 a.m. to between 12 and 1 p.m.," we held that the evidence was sufficient to support the convictions, regardless of whether the defendant was aware that her conduct would have caused the hyperthermia. Id.

By the application of our ruling in Ducker, the evidence in this instance must have been sufficient for a rational jury to have concluded, beyond a reasonable doubt (1) that the Defendant was "aware of the nature of the conduct," Tennessee Code Annotated § 39-11-302(b), when he treated S.H. "in such a manner as to inflict injury," Tennessee Code Annotated § 39-15-401(a); and (2) that, in so doing, he acted other than by accidental means.[5] Further, because the evidence was entirely circumstantial, the jury must have had a reasonable basis for the exclusion of "every other reasonable

---

[5] The Defendant argues, citing State v. Prater, 137 S.W.3d 25 (Tenn. Crim. App. 2003), perm. app. denied (2004), that the State was required to show beyond a reasonable doubt that the Defendant knew his conduct was abusive. In Prater, the Court of Criminal Appeals considered a conviction for aggravated child abuse arising from a defendant's knowingly giving her child twice the prescribed dosage of a dangerous attention deficit disorder medication over a period of days. Id. at 27-31. Although the court upheld the conviction, it also held that sections 39-15-401 and -402 "require that a defendant know his or her conduct is abusive." Id. at 33. This formulation, the court explained, is necessary in order to distinguish between a defendant who knowingly gives a victim a dangerous overdose that results in harm, on one hand, from "the act of a parent to help a child with a medical condition" that causes an unexpected "severe adverse reaction" resulting in harm, on the other. Id. Similar concerns arise when a child suffers from an unidentified condition that renders his or her skeleton susceptible to injury from normal handling. See In re Gaven R., No. M2005-01868-COA-R3-CV, 2007 WL 2198288, at *5-8 (Tenn. Ct. App. July 23, 2007).

The Defendant's reliance on Prater is not warranted. To say that the hypothetical defendant discussed in Prater was not aware "that . . . her conduct [was] abusive" is merely another way of saying that the means by which she caused the child's injury were accidental. Prater should not, however, be read to create any requirement beyond those contained in the language of sections 39-15-401 and -402. Cf. discussion of proposed jury instructions infra (identifying confusion that might arise from a jury instruction requiring that the State show that a defendant knew his or her conduct was abusive).

hypothesis save the guilt of the defendant." Crawford, 470 S.W.2d at 612.

These facts present a close question. The bulk of the evidence consisted of medical testimony as to the timing, the likely causes, and the unusual nature of S.H.'s injuries. Each physician described S.H. as having suffered from "non-accidental trauma," "non-accidental child abuse," "physical abuse," or "inflicted trauma." This medical testimony was corroborated by evidence that S.H. was in the custody and control of the Defendant at the time of the injuries to her right leg, the Defendant's evasive behavior during the course of the investigation, out-of-court statements by the Defendant that were inconsistent with the medical evidence, and the exclusion of Silcox, her mother, or anyone else as potential sources of the injuries. Under these circumstances, it is our assessment that the jury had the prerogative to infer that the Defendant acted knowingly, with an awareness of the nature of his conduct, rather than accidentally.

The physician witnesses testified extensively about the injuries, particularly the six "corner" leg fractures, and the potential sources of those injuries – all of which pointed to abuse. Every medical expert who addressed the issue expressed the view that the fractures were consistent with forceful twisting. While Drs. Roberts and Nunley disagreed as to whether flailing or jerking could have caused the injuries, there was no dispute as to the significance of the force required. Drs. Roberts, Nunley, and Campbell all testified that a fall on the stairway as described by the Defendant could not have caused four fractures to the right leg and two to the left.

At a minimum, therefore, the evidence was sufficient for a rational jury to have concluded beyond a reasonable doubt that the fractures were the result of either a forceful twisting or the flailing or jerking of both legs, and that any twisting incident to a fall, the only other reasonable explanation, could not have been the cause of all six fractures. Of significance, of course, is that S.H. suffered injury while in the Defendant's exclusive custody. Although the Defendant claimed to Detective Boucher that he might have caused the harm to her right leg in the July 13 fall, as Drs. Roberts and Campbell conceded was possible, the uncontradicted medical evidence established that S.H. suffered not simply one twisting injury to her right leg, but a total of six fractures in both legs, within twenty-four to forty-eight hours of the claimed fall. This and other medical evidence served to refute the claim by the Defendant that all fractures were the result of an accidental fall. Moreover, the testimony of Dr. Roberts discounted the suggestion that the injuries might have been caused by dropping S.H. and catching her by both legs. He explained that "a severe jerk" must have accompanied any such dropping activity – a possibility that a rational jury could have dismissed as exceedingly unlikely. Silcox's account of the Defendant's tossing of S.H. in the air and the manner in which he held S.H. provided nothing that could have suggested accidental twisting, flailing, or pulling of the nature or severity described by the physicians' testimony. Finally, the suggestion that the injuries were exacerbated by brittle bone disease or the result of diaper-changing were firmly rebuffed by the experts. Cf. In re Gaven R., 2007 WL 2198288, at *5-8 (declining to find that the State had proven abuse by clear and convincing evidence due to expert testimony that infant's fractures were caused by increased bone fragility). Thus, we conclude that a rational finder of fact could have excluded all possible sources of S.H.'s leg injuries other than the Defendant's knowing

conduct.[6]

## Sufficiency of Evidence of Serious Bodily Injury

The Defendant next argues that the evidence was insufficient to support a finding of serious bodily injury, the element necessary to elevate the crimes from child abuse to aggravated child abuse. The Court of Criminal Appeals disagreed, and so do we.

"Serious bodily injury" is defined as a bodily injury that involves any of the following:

(A) A substantial risk of death;
(B) Protracted unconsciousness;
(C) Extreme physical pain;
(D) Protracted or obvious disfigurement; or
(E) Protracted loss or substantial impairment of a function of a bodily member, organ or mental faculty[.]

Tenn. Code Ann. § 39-11-106(a)(34) (1997). The Defendant insists that no rational jury could have determined that S.H. suffered from "extreme physical pain" due to the four fractures in one leg and two in the other. The Defendant argues that the unique features of infant minds and skeletons, when combined with S.H.'s inability as a two-month-old infant to articulate the level of her pain, made it impossible for the jury to conclude beyond a reasonable doubt that the pain qualified as extreme.

The medical testimony established that S.H. behaved in a manner consistent with pain in her right leg. The jury heard medical testimony confirming the severity of her injuries. Dr. Nunley described the pain for injuries of that nature as extreme and explained that older children with similar fractures experience an overwhelming degree of pain. Dr. Roberts compared the pain from the injuries to the continuous injection of a vaccine for an uninterrupted period of days or weeks. From this, a rational jury could have concluded that the pain was extreme, and thus that bodily injury qualified as serious.

## "Acquittal-First" Jury Instructions

The Defendant argues that the trial court erred by employing "acquittal-first" jury instructions that forbid the jury from considering a lesser-included offense until it has reached a unanimous verdict of acquittal on any greater offenses. Specifically, the Defendant argues that the instructions are repugnant to the constitutional right to trial by jury, see Ely, 48 S.W.3d at 727, as well as illogical and unjustified by policy considerations.

---

[6] "The law passed by a legislature cannot exist separate and apart from the juries that apply it." Heather K. Gerken, Second-Order Diversity, 118 Harv. L. Rev. 1099, 1129 (2005). Article I, section 6 of the Tennessee Constitution guarantees that all issues of fact in a criminal trial will be determined by twelve jurors properly instructed by the trial court. State v. Garrison, 40 S.W.3d 426, 432 (Tenn. 2000); see also Grooms v. State, 426 S.W.2d 176, 176-77 (Tenn. 1968). This guarantee assures that those accused by the State cannot be convicted except though "trials by the people themselves." Akhil Reed Amar, The Bill of Rights as a Constitution, 100 Yale L. J. 1131, 1195 (1991) (quoting Letter from Thomas Jefferson to David Humphreys (Mar. 18, 1789)).

This Court recently held that acquittal-first instructions are permitted by the Tennessee Constitution. State v. Davis, 266 S.W.3d 896, 905 (Tenn. 2008). Although we disagreed on the policy considerations raised to support an acquittal-first jury instruction as compared to the alternative "reasonable efforts" approach, compare Davis, 266 S.W.3d at 905-08 with id. at 910-16 (Wade, J., concurring), the acquittal-first instruction was confirmed as the prevailing practice.

**Jury Instructions on Knowledge and Accidental Means**

As his final issues, the Defendant argues that the trial court erred by rejecting his requests for two supplemental jury instructions intended to clarify the meanings of the terms "knowing conduct" and "accidental means." In criminal cases, a defendant has a right to a correct and complete charge of the law. Garrison, 40 S.W.3d at 432 (Tenn. 2000). Thus, the trial court has the duty to give a comprehensive instruction of the law as applicable to the facts in each case, State v. Thompson, 519 S.W.2d 789, 792 (Tenn. 1975), including a definition of the elements of each offense. See Ducker, 27 S.W.3d at 899; State v. Cravens, 764 S.W.2d 754, 756 (Tenn. 1989). The purpose of a special instruction is "to supply an omission or correct a mistake made in the general charge, to present a material question not treated in the general charge, or to limit, extend, eliminate, or more accurately define a proposition already submitted to the jury." State v. Cozart, 54 S.W.3d 242, 245 (Tenn. 2001). The refusal to grant a special request for instruction is error only when the general charge does not fully and fairly state the applicable law. On appellate review, a jury instruction must be considered in its entirety and read as a whole rather than in isolation. State v. Leach, 148 S.W.3d 42, 58 (Tenn. 2004).

The first of the Defendant's special requests was as follows:

A defendant must "know" that his treatment of the child is abusive, even if it need not be proven that he "know" that his conduct will result in bodily injury or serious bodily injury. The state is required to prove beyond a reasonable doubt that the defendant knowingly treated the alleged victim in an abusive manner and knew his conduct was abusive.

The trial court declined to grant this request and, instead, provided the jury with a definition of "knowingly" based upon the 2005 Tennessee Pattern Jury Instruction for aggravated child abuse and neglect, which provides, in relevant part, as follows:

"Knowingly" means that a person acts knowingly with respect to the conduct or to circumstances surrounding the conduct when the person is aware of the nature of the conduct or that the circumstances exist. A person acts knowingly with respect to the result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result.

The requirement of "knowingly" is also established if it is shown that the defendant acted intentionally.

-15-

"Intentionally" means that a person acts intentionally with respect to the nature of the conduct or to a result of the conduct when it is the person's conscious objective or desire to engage in the conduct or cause the result.

7 T.P.I.–Crim. 21.01 (9th ed. 2005) (footnotes omitted). The trial court's instruction differed from the 2005 version's definition of "knowingly" in minor ways. For example, the trial court used the words "certain circumstances exist" whereas the 2005 Pattern Instructions suggested "the circumstances exist." The trial court also made a partial correction as to the "result-of-conduct" language in the instruction which dealt with "intentionally," explaining that the phrase "[o]r a result of the conduct" "needs to be marked out."

As the annotations provide, the Pattern Instructions have been modified since this trial to reflect our holding in Ducker that aggravated child abuse is a nature-of-conduct offense. 7 T.P.I.–Crim. 21.01(a) (12th ed. 2008), at n.5. The current version omits superfluous language regarding the application of "knowingly" to the result of a defendant's conduct:

"Knowingly" means that a person acts knowingly with respect to the conduct or to circumstances surrounding the conduct when the person is aware of the nature of the conduct or that the circumstances exist.

The requirement of "knowingly" is also established if it is shown that the defendant acted intentionally.

"Intentionally" means that a person acts intentionally with respect to the nature of the conduct when it is the person's conscious objective or desire to engage in the conduct.

Id.; see also 7 T.P.I.–Crim. 21.01(b) (12th ed. 2008). While the current instruction reflects the better practice, the result-of-conduct terminology, while unnecessary, was not prejudicial; therefore, the trial judge's rejection of the special instruction and use of the 2005 version does not serve as a basis for a new trial. Read as a whole, see Leach, 148 S.W.3d at 58, the trial court's instruction on "knowingly" fully and fairly described the applicable law.

Moreover, the special request by the Defendant would not have more accurately defined the applicable law. In our view, the language sought by the Defendant would have required the State to establish that he knew that his conduct met the statutory definition of child abuse, a requirement having no basis in law. Cf. Moore v. Lawrence County, 230 S.W.2d 666, 668 (Tenn. 1950) ("[I]n criminal proceedings, 'ignorance of the law excuses no man.'" (quoting Gibson's Suits in Chancery § 74 (1937 ed.)).).

The Defendant further argues that the trial court erred by refusing to grant a lengthy special request purporting to define "accidental means." The requested language was taken from Brown Shoe Co. v. Reed, 350 S.W.2d 65, 69 (Tenn.1961):

An accident is generally an unlooked for mishap, an untoward event, which is not expected or designed. Generally in most such cases this Court has repeatedly said that a compensable injury should be the result of something happening by accidental means though the act involving the accident was intentional. Accidental means ordinarily mean an effect which was not the natural or probable consequence of the means which produced it, an effect which does not ordinarily follow and cannot be reasonably anticipated from the use of those means, an effect which the actor did not intend to produce and which he cannot be charged with the design of producing. It is produced by means which were neither designed nor calculated to cause it. It cannot be reasonably anticipated, it is unexpected, it is produced by unusual combinations of fortuitous circumstances and such an injury is an injury by accidental means.

Although the Tennessee Pattern Instructions repeatedly mention "accidental means," they provide no definition of the term. See 7 T.P.I.–Crim. 21.01(a)-(b); 7 T.P.I.–Crim. 6.02 (12th ed. 2008); 7 T.P.I.–Crim. 6.09 (12th ed. 2008); 7 T.P.I.–Crim. 21.02(a) (12th ed. 2008); 7 T.P.I.–Crim. 21.02(b) (12th ed. 2008); 7 T.P.I.–Crim. 29.13(b) (12th ed. 2008).

While instructing the jury on the elements of aggravated child abuse, including the term "accidental means," the trial court provided the following charge:

"Accidental means" means before the defendant can be convicted of the crime submitted to the jury[, t]he state must have proven beyond a reasonable doubt that the injuries of the child were brought about as the result of the criminal agency of the defendant; that is, that the injury of the child was due to the unlawful act of the defendant. If the injury was caused by accidental means by the defendant other than by a knowing child abuse, then you would not be justified in finding the defendant guilty. If you find that the defendant's acts, if any, did not unlawfully cause the injuries of the child or if you, the Jury, have a reasonable doubt as to this proposition, you must find him not guilty.

(emphasis added). The trial court further instructed the jury that the Defendant could have been found guilty only if he had acted other than by accidental means.

This charge adequately described the applicable law. There are several reasons we so hold. Initially, "accidental" is a common term which jurors use and understand in their practical experience. "Where words and terms are in common use and are such as can be understood by persons of ordinary intelligence, it is not necessary, in the absence of anything in the charge to obscure their meaning, for the court to define or explain them." State v. Summers, 692 S.W.2d 439, 445 (Tenn. Crim. App. 1985). We see no reason why the jurors would somehow be better equipped to ascertain the meaning of a "mishap" or "untoward event" than "accidental means," as suggested by the Defendant. Further, the proposed instruction from Brown Shoe Company refers to an intent to produce a result – despite the fact that our ruling in Ducker plainly classified aggravated child

-17-

abuse as a nature-of-conduct offense. Finally, any reference to a "compensable injury," as used in the <u>Brown Shoe Company</u> case, would likely have created confusion rather than serving to either supply an omission, correct a mistake, or more accurately define the term, as is essential for the grant of a special request. In short, the refusal to give the instruction was proper.

## Conclusion

Once the trial court has discharged its "obligation . . . to explain the law," <u>McGowan v. State</u>, 17 Tenn. (9 Yer.) 184, 195 (1836), the factual issues must be resolved by the trier of fact, and this Court should neither re-evaluate the weight nor re-assess the credibility of the evidence. <u>State v. Reid</u>, 91 S.W.3d 247, 277 (Tenn. 2002). In our view, the jury acted within its prerogative in this instance by rejecting the defense of accident and by concluding that the circumstantial evidence excluded every other reasonable hypothesis except for the guilt of the Defendant. Further, the trial court did not commit error by denying the special requests and by providing other instruction as to the defense of accident. The judgment of the Court of Criminal Appeals is, therefore, reversed, and the conviction and sentence for aggravated child abuse are reinstated. It appearing that the Defendant is indigent, the costs of this appeal are taxed to the State.

_____
GARY R. WADE, JUSTICE