IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs March 19, 2013

## STATE OF TENNESSEE v. ARTHUR T. ROGERS

**Appeal from the Circuit Court of Warren County**
**No. F12181    Larry B. Stanley, Jr., Judge**

---

**No. M2012-01002-CCA-R3-CD - Filed April 23, 2013**

---

Arthur T. Rogers ("the Defendant") was convicted by a jury of two counts of aggravated sexual battery. The trial court subsequently sentenced the Defendant to two concurrent terms of nine years in the Tennessee Department of Correction. In this delayed direct appeal, the Defendant challenges the sufficiency of the evidence supporting his convictions. After a thorough review of the record and the applicable law, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments**
**of the Circuit Court Affirmed**

JEFFREY S. BIVINS, J., delivered the opinion of the Court, in which D. KELLY THOMAS, JR., and CAMILLE R. MCMULLEN, JJ., joined.

Lauren Zechman-Denney (on appeal), McMinnville, Tennessee, and Trenena Wilcher (on appeal and at trial), McMinnville, Tennessee, for the appellant, Arthur T. Rogers.

Robert E. Cooper, Jr., Attorney General & Reporter; Rachel Harmon, Assistant Attorney General; Lisa S. Zavogiannis, District Attorney General; and Tom Miner, Assistant District Attorney, for the appellee, State of Tennessee.

## OPINION

### Factual and Procedural Background

The Defendant was indicted in August 2009 for one count of rape of a child and one count of aggravated sexual battery. The Defendant was tried before a jury and the following proof was adduced:

H. N.[1] testified that she was born on October 14, 1996, making her fourteen years old at the time of trial in November 2010. She was in eighth grade and lived with her grandmother and her father. She stated that, in July 2009, she was twelve years old. At that time, she was living with her aunt, Michelle Nichols, as well as her uncle, two cousins, and her sister. Her father was "on the road" as a truck driver and was home only on weekends. Her mother lived in Indiana but had family in Oklahoma.

In July 2009, H. N. spent two and a half weeks visiting her mother's family in Oklahoma. After she returned, she and her sister went to visit their grandmother, Betty Rogers ("Grandmother"), at Grandmother's residence, arriving at night. Grandmother's husband, the Defendant, was also there. H. N. and her sister slept on pallets on the floor. The next morning, after she got up, H. N. went to a double recliner in the living room and fell asleep. Grandmother woke her up to see if she wanted to go out with Grandmother and H. N.'s sister, but H. N. said no. Grandmother and H. N.'s sister left, and H. N. remained on the recliner.

The Defendant was sitting at the table watching television. After Grandmother and H. N.'s sister left, he came over and joined H. N. on the double recliner. Because she was lying across the piece of furniture, she had to move her feet for him to sit down. When he sat down, she laid her feet across him. At the time, she was wearing the T-shirt and pajama pants that she had slept in the night before. H. N. testified about what happened next:

> He sat there watching TV for a few minutes, and then he moved his hand. His hand goes under my shirt on my stomach. Then, his hand moves up to my breast. He is feeling. Then, he lifts up my shirt and my bra and he put his mouth on one of my breasts. Then, he put his hand down my pants.

She stated that she did not try to stop the Defendant because she was "[a]fraid he would hurt [her]." She added that, after the Defendant put his hand down her pants, "he was feeling around. Then, he put one of his fingers inside of [her]." She stated that "[i]t hurt." She told him to stop and he did. She then got up, went to the bathroom, and locked the door. She used the bathroom, which she said caused her to feel a burning sensation, and then returned to the living room and sat on the couch. At that time, the Defendant was at the kitchen table. H. N. testified that he came over to her and told her "he is sorry, and that he will never do it again." The Defendant left the room to take a nap. About twenty minutes later, Grandmother and H. N.'s sister returned.

---

[1] It is this Court's policy to identify the victims of sex crimes by only their initials.

The family ate lunch together, including the Defendant, and then Grandmother took H. N. to an eye doctor appointment. H. N. spent that night at Grandmother's residence. H. N. did not tell Grandmother what had happened because she thought she would not be believed. She did not tell any other family members.

Some time later, someone proposed another visit to Grandmother's residence, and H. N. said she did not want to go. While H. N. was speaking on the phone with her father, he asked her why she did not want to return. She told him "that he was being nasty." H. N.'s father "wanted his friend Barbara to find out why," and H. N. then spoke with Barbara Brods about what had happened.

H. N. subsequently spoke with people at the Child Advocacy Center ("CAC") where she told "a lady" what had happened. She then spoke with another person, Ms. Moseley, who talked to her about making a recorded telephone call to the Defendant. They made the phone call together, and H. N. spoke with the Defendant. She since had listened to the recording of the call and stated that it was a full and accurate recording.

On cross-examination, H. N. explained that she had visited with Grandmother and the Defendant about once a month. While she was in Oklahoma, she stayed with an aunt and uncle. Asked if she wanted to return to them, she replied, "I enjoyed being there, but I would rather live here." She denied having told Grandmother that she wanted to return to Oklahoma to live.

H. N. acknowledged that, at the time in question, the Defendant used an oxygen machine, took a lot of medication, sometimes used a wheelchair, and had a nurse coming to the house. She also acknowledged that the questions she asked the Defendant during the phone call had been written by someone else. H. N. stated that it was a week and a half after the Defendant touched her that she told her father.

Nicole Moseley testified that she was a detective sergeant with the McMinnville Police Department ("MPD"). She met with H. N. at the CAC after watching, on closed circuit television, H. N. being interviewed by a forensic interviewer there. Sgt. Moseley determined that a phone call between H. N. and the Defendant would be appropriate "to corroborate her story." She set up the necessary equipment and assisted H. N. in knowing what to say. She monitored the phone call and assisted H. N. throughout the conversation. She later listened to the recording of the call and testified that it was accurate.

The recording was admitted into evidence and played for the jury. During the phone call, H. N. repeatedly asked the Defendant why he "did that" and why he "touch[ed]" her "like that." The Defendant repeatedly responded, "I don't know." When the Defendant

asked her if she was going to come back to visit, she said, "Not until I get some answers." H. N. then said, "You told me you were sorry." The Defendant responded, "I am sorry, if I've done anything wrong, I'm sorry. We ain't done nothing wrong to you." Toward the end of the phone call, H. N. asked the Defendant, "Don't you feel bad for doing this to me?" The Defendant replied, "Yes." When she asked again, "Then why did you touch me?", the Defendant repeated, "I don't know." H. N. did not use the term "fondle" during the phone call.

On cross-examination, Sgt. Moseley acknowledged that "children are very susceptible to suggestive questions by adults." She also acknowledged that she was not present when H. N. spoke with Barbara Brods.

Derwin Adcock, captain of the MPD, testified that he managed criminal investigations. He interviewed the Defendant about H. N.'s allegations, and, according to Capt. Adcock, the Defendant knew that the interview was related to the phone call he had received from H. N. The Defendant told Capt. Adcock that H. N. had accused him of "fondling" her, which the Defendant denied. Later in the interview, Capt. Adcock brought in a tape recorder. Capt. Adcock testified: "When the tape recorder was first brought in, he focused primarily on the tape recorder. Then, when we continued the interview, the story changed from I didn't do anything to if I did, I don't remember."

The interview was videotaped and lasted approximately two hours. Capt. Adcock stated that he had reviewed clips from the interview excised by the prosecution, and he testified that they were accurate and that their content was consistent with the entire interview. The clips were admitted into evidence and played for the jury. In the first clip, the Defendant referred to the phone call and explained that he "couldn't really make out what [H. N.] was gettin[g] at." He stated that she asked him, "Why did you do it?" and that he responded, "Done what?" He told Capt. Adcock that she then said, "You fondled me." He stated that he denied it to her. The clips also show the Defendant stating, repeatedly, that he did not remember doing anything to H. N. after a recording device was brought into the interview room.

On cross-examination, Capt. Adcock acknowledged that the Defendant never admitted to the accusations. He also acknowledged that the Defendant had said that, during his phone conversation with H. N., he "didn't know what she meant or what she was talking about."

Grandmother testified that she had been married to the Defendant for twenty-six years. Her son was H. N.'s father. The Defendant was H. N.'s step-grandfather. H. N. and her sister came to spend the weekend with them in July 2009. They arrived late at night from their trip to Oklahoma, and they went to bed. The next morning, Grandmother and H. N.'s

older sister left on an errand. At that time, H. N. was laying across the double recliner and indicated that she did not want to go with them. The Defendant was sitting at the dining room table.

Grandmother was gone about forty-five minutes to an hour. When she returned, H. N. was sitting on the sofa, not the double recliner. The Defendant was in bed. Later that day, Grandmother took the girls to an eye doctor appointment, and they all then returned home and spent the night. The girls left the next day after church.

H. N. did not say anything about the Defendant to Grandmother. However, instead of giving Grandmother her usual "bear hug" when she left, H. N. "just barely touched [her] on the shoulder and said, bye, nanny."

A few days later, Grandmother expected H. N. to come stay with them again. However, H. N. called and said that she was not coming. H. N. never visited again while the Defendant was there.

A few days after H. N. called, she called again and asked to speak with the Defendant. The next day, Grandmother drove the Defendant to the MPD. Grandmother spoke with Det. Moseley, and Det. Moseley told her about the allegations. As soon as the Defendant got in the car for the return trip home, Grandmother confronted him. She testified:

> I asked him if it was true. I said, I am going to ask you one time, is this true that you molested my granddaughter. He said, no, I didn't. I was crying and I backhanded me [sic]. I said, yes, you did.

They spoke about it again later:

> One day I was sitting at the dining room table doing Word Search and he came over and started arguing toward me, like always, and he said, it was your fault that this happened. I said, well, everything that goes wrong in your life usually is. I said, how is this my fault? He said, because you don't love on me no more.

Grandmother added that the Defendant had hit her in the past and that she was afraid he would hit her again, asserting that he was physically able to overpower her in spite of his infirmities.

On cross-examination, defense counsel asked Grandmother if "right before this incident when [H. N.] came back from Oklahoma, she told you that she was going to go back

to Oklahoma and it didn't matter what she had to do to get there?" Grandmother responded, "Something like that." Counsel then asked, "She said it didn't matter who she had to hurt to get there, didn't she?" Grandmother responded, "No, she never said that."

Grandmother testified that the Defendant had had a massive heart attack fourteen years earlier, which ended their intimate relationship. She acknowledged that she would never believe the Defendant over H. N.

On behalf of the Defendant, Jean Miller testified that she had known him for over fifty years. She stated that the Defendant was trustworthy, that she "never saw anything [i]nappropriate out of him," and that she "would trust him with [her] life." She also stated that, in her opinion, the Defendant told the truth.

Imogene Fultz testified that she was a nurse employed by Care-All Home Health and that she had been the Defendant's nurse for seven or eight years. She visited the Defendant at his home once a week. According to Fultz, the Defendant suffered from hypertension, congestive heart failure, "atrofib," diabetes, and "abnormal gait." The Defendant had never behaved inappropriately toward her. At the time in question, her notes indicated that the Defendant was weak and had poor endurance.

The Defendant testified that he was sixty-nine years old. He stated that he had "lung problems," "stomach problems and leg problems and heart problems." He had a "defibrulator [sic] and a pacemaker at the same time."

The Defendant testified that, on the night H. N. came over after her visit in Oklahoma, she told him, Grandmother, and her sister, "I am going back to Oklahoma, I don't care who I have to hurt or what I have got to do." Asked what happened on the morning in question, he testified,

> She was laying down in my recliner. I told her to get up and get on the couch because I wanted to watch Steve McNair's funeral. She didn't want to. I made her get up and get over there. Steve McNair's funeral came on. . . .
>
> And just as quick as the funeral was over, I got up and went to bed. [H. N.] was in the bathroom and I hollered and told her I was laying back down. Then, the next thing I knowed [sic], Betty was waking me up to eat some dinner.

He denied that he had touched H. N. at any time.

He recalled the phone call with H. N. some days later but stated that he "couldn't make out half of what she was saying." He explained that, when she asked him why he would touch her, he responded that he did not know because he did not know "if [he] touched her when she was getting up and getting on the couch," explaining that they were "all the time picking on each other." He also explained his apology to her, stating, "I am all the time telling her I am sorry. She comes in and tells us something or she gets hurt or something. I say, well, I am sorry like that." He stated that he had made such apologies to her "all her life." He reiterated that he did not know what she was talking about when she called him.

On cross-examination, the Defendant stated that he believed H. N. made the allegations against him, and persisted in them, in an attempt to return to Oklahoma. He also stated that H. N. "lies a lot." The prosecutor then referred to the phone call in which H. N. asked the Defendant why he had touched her, and then asked him, "And you didn't deny having touched her, did you?" The Defendant responded, "No, because I think when she got off the recliner to get on the couch, I think I pecked her on the head. I thought that was what she was talking about. We are all the time picking on each other." The prosecutor asked, "But what you told her was you didn't know why you touched her. Right?" The Defendant responded, "Well, I didn't know why I hit her." The prosecutor stated, "Well, you just explained to the jury why," and continued: "But that is not what you told her. You didn't say, well [H. N.], I just accidentally pecked you on the head. I don't know what the problem is. You said, I don't know why I touched you." The Defendant persisted that he did not know "what all she said."

The Defendant also stated during cross-examination that, during his interview with Lt. Adcock,[2] he asked for a lawyer three times, but that "he never would give me one." The Defendant maintained that Lt. Adcock did not turn on the videorecorder until after he had repeatedly asked for a lawyer. The Defendant later stated that he asked Lt. Adcock for a lawyer twice and, the third time, he made his request to a woman.

The Defendant put on no other witnesses, and the State put on no rebuttal proof. The jury subsequently found the Defendant guilty of two counts of aggravated sexual battery. The verdict forms, included in the record on appeal, indicate that Count One referred to the "alleged digital penetration in the vaginal area" and that Count Two referred to the "alleged touching of breast area . . . ." The trial court later entered an agreed sentence of nine years

---

[2] At the time of the Defendant's interview, Capt. Adcock still had the rank of Lieutenant.

on each count, to be served concurrently. In this delayed direct appeal, the Defendant only challenges the sufficiency of the evidence underlying his convictions.[3]

## Standard of Review

Our standard of review regarding sufficiency of the evidence is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); see also Tenn. R. App. P. 13(e). After a jury finds a defendant guilty, the presumption of innocence is removed and replaced with a presumption of guilt. State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992). Consequently, the defendant has the burden on appeal of demonstrating why the evidence is insufficient to support the jury's verdict. State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). The appellate court does not weigh the evidence anew; rather, "a jury verdict, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts" in the testimony and all reasonably drawn inferences in favor of the State. State v. Harris, 839 S.W.2d 54, 75 (Tenn. 1992). Thus, "the State is entitled to the strongest legitimate view of the evidence and all reasonable or legitimate inferences which may be drawn therefrom." Id. (citation omitted). This standard of review applies to guilty verdicts based upon direct or circumstantial evidence. State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (citing State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)). In Dorantes, our Supreme Court adopted the United States Supreme Court standard that "direct and circumstantial evidence should be treated the same when weighing the sufficiency of such evidence." Id. at 381. Accordingly, the evidence need not exclude every other reasonable hypothesis except that of the defendant's guilt, provided the defendant's guilt is established beyond a reasonable doubt. Id.

## Analysis

Our criminal code defines aggravated sexual battery as follows: "unlawful sexual contact with a victim by the defendant or the defendant by a victim" when "[t]he victim is less than thirteen (13) years of age." Tenn. Code Ann. § 39-13-504(a)(4) (2006). "Sexual contact" is defined as including "the intentional touching of the victim's . . . intimate parts, or the intentional touching of the clothing covering the immediate area of the victim's . . .

---

[3] The trial court entered the judgments of conviction on December 17, 2010. The defense filed a motion for new trial on December 28, 2010. On March 28, 2011, the trial court entered an order allowing the defense to withdraw its motion for new trial. On September 30, 2011, the Defendant, proceeding pro se, filed a petition for post-conviction relief "and delayed appeal." After a hearing held on March 28, 2012, the post-conviction court granted a delayed appeal by written order entered April 26, 2012. On the same day, the Defendant filed his notice of appeal.

intimate parts, if that intentional touching can be reasonably construed as being for the purpose of sexual arousal or gratification." Id. § 39-13-501(6) (2006). "Intimate parts" is defined as including "the primary genital area, groin, inner thigh, buttock or breast of a human being." Id. § 39-13-501(2).

In this case, H. N. testified that the Defendant touched and sucked her breast and that he then placed his hand on her genital area, including digital penetration. She testified that she was twelve years old at the time the Defendant engaged in this conduct. Additionally, Grandmother testified that, when she spoke with the Defendant about the alleged molestation, he told her that it was "[her] fault that this happened." When she asked how it was her fault, she testified, the Defendant responded, "because you don't love on me no more." The Defendant's statements to Grandmother permit the reasonable inference that the Defendant touched H. N. "for the purpose of sexual arousal or gratification." This proof is sufficient to support the Defendant's two convictions of aggravated sexual battery.

The Defendant contends that the proof is not sufficient because H. N.'s testimony "was not credible." He refers to her alleged comment that she intended to return Oklahoma and did not care who she had to hurt or what she had to do in order to succeed. He also refers to his own testimony that H. N. lied frequently and that she waited almost two weeks to report the illegal conduct. The Defendant also asserts that the record lacks any physical evidence corroborating H. N.'s testimony.

As set forth above, this Court does not reassess witness credibility when reviewing the sufficiency of the evidence. See, e.g., Dellinger v. State, 279 S.W.3d 282, 292 (Tenn. 2009) ("It is well established that appellate courts do not reassess credibility determinations."). It is the jury's duty to determine who to believe when presented with conflicting accounts. In this case, the jury chose to accredit the victim's testimony and rejected the Defendant's testimony. The jury acted within its prerogative, and the evidence is sufficient to support the jury's verdicts. Accordingly, the Defendant is entitled to no relief on this basis.

The Defendant also is not entitled to relief on the basis that there is no physical evidence corroborating H. N.'s testimony. This Court previously has upheld a conviction for aggravated sexual battery based on the testimony of two small children and no physical proof. See State v. Jamie Emerson New, No. W2005-01014-CCA-R3-CD, 2006 WL 211816, at *5-6 (Tenn. Crim. App. Jan. 24, 2006); see also State v. Gregory Lee Smith, No. W2006-01962-CCA-R3-CD, 2007 WL 3132938, at *5-6 (Tenn. Crim. App. Oct. 26, 2007) (evidence sufficient to support defendant's conviction of aggravated sexual battery on basis of minor victim's testimony and no physical evidence), perm. app. denied (Tenn. Apr. 7, 2008).

We hold that the evidence is sufficient to support the Defendant's two convictions of aggravated sexual battery.

## **Conclusion**

For the reasons set forth above, we affirm the judgments of the trial court.


_____
JEFFREY S. BIVINS, JUDGE