IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
August 30, 2011 Session

## STATE OF TENNESSEE v. TYESHIA STEWART

**Direct Appeal from the Criminal Court for Knox County**
**No. 88062     Richard R. Baumgartner, Judge**

**No. E2011-00232-CCA-R3-CD - Filed February 24, 2012**

The defendant was convicted in a jury trial of voluntary manslaughter, a Class C felony, for killing her boyfriend following an altercation. She was sentenced as a Range I, standard offender to six years, split one year in jail with the balance to be served on probation. The defendant now appeals her conviction and sentence, claiming that the evidence was insufficient to support her conviction and that the trial court erred by failing to sentence her to the minimum sentence. After carefully reviewing the record and the arguments of the parties, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

JOHN EVERETT WILLIAMS, J., delivered the opinion of the Court, in which JOSEPH M. TIPTON, P.J., and JAMES CURWOOD WITT, JR., J., joined.

Bruce E. Poston and Jamie Poston, Knoxville, Tennessee, for the appellant, Tyeshia Stewart.

Robert E. Cooper, Jr., Attorney General and Reporter; Rachel E. Willis, Senior Counsel; Randall Eugene Nichols, District Attorney General; and Ta Kisha Fitzgerald, Assistant District Attorney, for the appellee, State of Tennessee.

## OPINION

The defendant was indicted on November 6, 2007, on one count of second degree murder for killing her boyfriend, D'juansay Freeman, on October 13, 2007. The evidence gathered during the investigation and presented at trial generally established that the stabbing was the culmination of an altercation between the defendant and the victim; the defendant never denied stabbing the victim but maintained that the stabbing was done in self-defense. The following evidence was presented at trial.

The State's first witness was Ms. Beth Goodman, a senior evidence technician in the forensic unit of the Knoxville Police Department. Ms. Goodman testified that she responded to a crime scene on Bertie Rand Street in South Knoxville on October 13, 2007, and that she took photographs of that crime scene when she arrived. During her testimony, she authenticated many of these photographs, which were then admitted into evidence. She testified that when she arrived at the crime scene, she saw a large serrated kitchen knife lying outside the apartment next to the door. There were several blood smears and bloodstains inside the apartment's entryway. She testified that these blood smears were consistent with the victim's lying on the ground while bleeding and then either moving or being moved by someone else. Ms. Goodman identified various other spots in the apartment where blood drops could be seen. Ms. Goodman's testimony continued by identifying blood transfers that appeared in her pictures. These blood transfers appeared around the bottom of the apartment door as well as on the door lock. Ms. Goodman testified that these blood transfers would be consistent with the victim's having attempted to turn the lock on the apartment's front door while having blood on his hands. Ms. Goodman also identified a picture she took of a bag that appeared to contain marijuana and another picture that depicted what appeared to be cocaine, additional marijuana, and some prescription pills bearing the victim's name.

Ms. Goodman testified that when she arrived at the apartment, the victim was still at the scene and the first responders were preparing to transport him to the hospital. Ms. Goodman identified various photographs she took of the victim and pointed out blood that appeared in these photographs on the victim's face and hands, as well as bleeding from a wound to his arm. Ms. Goodman testified that the victim's primary injury was to his shoulder. Ms. Goodman testified that she confiscated the large bloodstained serrated knife and the victim's shirt. She authenticated these items, and they were entered into evidence. Ms. Goodman testified that the knife at issue was thirteen and a half inches in total length and that its blade was eight inches long.

Ms. Goodman testified that she went to the police station after the defendant had been transported there, where she photographed the defendant in order to create a record of the defendant's injuries. Ms. Goodman testified that she photographed the defendant's left cheek area, her hands, her feet, and various parts of her body that bore bite marks. She testified that the defendant told her that Ms. Goodman had taken photographs of every injury the defendant had sustained. In these pictures, Ms. Goodman identified visible bite marks on the defendant's back and abdomen. Ms. Goodman took a picture of the defendant's face, which had a red mark. Ms. Goodman testified that the victim did not have any blood on or visible injuries to her hands, legs, or feet.

On cross-examination, Ms. Goodman authenticated additional pictures of the apartment. In addition, she testified that the bite marks she saw on the defendant's back

appeared to have had flesh torn out of them. One of these bite marks appeared to be older than the others.

The State's next witness was Ms. Cassandra Rogers, who lived at the apartment complex on Bertie Rand Street at the time of the incident. Ms. Rogers testified that she was watching a scary movie on the night in question when she heard a scream that did not emanate from the television. She testified that she looked out her front door and saw the defendant standing outside screaming. She testified that she had never had any interaction with the defendant prior to seeing her screaming on that night. Ms. Rogers testified that she came outside her apartment and asked the defendant if she was okay. She testified that the defendant did not answer and walked back into her apartment. She testified that after this occurred, everyone in the apartment complex came outside the defendant's apartment. She testified that a neighbor opened the door to the defendant's apartment and entered it. Ms. Rogers testified that she looked into the open door and saw the victim lying on the floor near the door. Blood was coming out of the victim's mouth and his eyes were staring off into the distance.

Ms. Rogers testified that she called 911 and that the operator instructed her to remain on the scene until help arrived. She testified that she remained on the scene, watching the victim and counting his respirations for the 911 operator until the police arrived. Ms. Rogers testified concerning the location of the victim's legs and body at the time that she discovered him. She also testified that a large serrated knife, later found by police, was initially located on the floor outside of the apartment, near the defendant's neighbor's door. During her cross-examination, Ms. Rogers further emphasized that the defendant was screaming and hysterical when she first appeared outside Ms. Rogers' apartment.

The State's next witness was Detective Ryan Flores, a violent crimes investigator with the Knoxville Police Department. He testified that he responded to a stabbing call at an apartment complex on Bertie Rand Street on October 13, 2007. As he approached the crime scene, he observed a large knife outside on the walkway. He testified that he instructed Ms. Goodman to photograph and take possession of the knife. He testified that when he arrived, emergency personnel were taking the victim to the hospital. He immediately noticed blood in the entranceway to the apartment. When he determined that the defendant was the owner of the house, he ordered everyone out of the house until he could obtain her consent or a search warrant to search the premises. He testified that, in the meantime, he secured the crime scene and took statements from the defendant's neighbors, Ms. Chantel Rice and Mr. Antoine Burdine.

Detective Flores testified that he interviewed the defendant at the police station after informing her of her *Miranda* rights. Detective Flores stated that the defendant waived those

rights, made a statement to him, and gave her consent for the police to search her apartment. Detective Flores testified that they transported the defendant back to her apartment during the search so that she could revoke her consent at any time.

Detective Flores testified that during her interview, the defendant told him that she and the victim were having an argument on the night in question and that, twice, a physical fight had taken place. He testified that the defendant told him that the fighting had subsided and that the two were talking things over on the sofa when a more volatile fight suddenly erupted. He testified that the defendant told him that various things the victim had told her and names he had called her during this fight had built up her emotions and that she retrieved a knife and, although not meaning to do so, ended up stabbing the victim. At this point, the State entered the defendant's videotaped statement into evidence and played it for the jury.

Detective Flores testified that the defendant told him during the interview that she had called 911 twice that evening. Detective Flores confirmed that two calls were made to 911 – the first call was recorded at 12:05 a.m. and the second call was recorded at 12:11 a.m. Both 911 tapes were played for the jury. Based on the allegations made against the victim by the defendant during her police interview, Detective Flores testified that he checked to find out if the defendant had ever filed an offense report against the victim and determined that she had not. Detective Flores also determined that the defendant had never sought to obtain a protective order against the victim. Finally, the detective testified that the defendant had no injuries to her neck that might indicate that she had been choked on the night in question. Detective Flores testified that the victim did have a fresh bite mark on her side and an older bite mark on her back.

On cross-examination, Detective Flores testified that on the first 911 tape, the defendant's voice could be heard requesting the police to come over and get "this guy" out of the defendant's apartment. During the second 911 tape, the defendant's voice was frantic, distraught, and very difficult to understand. The detective testified that during the police search of the defendant's apartment, they found marijuana and cocaine in a drawer that also contained a medicine bottle belonging to the victim. Detective Flores testified that the defendant was not charged for possession of those drugs. Detective Flores testified that the victim was found to have bite marks on his right arm that could have been consistent with his choking the defendant and her biting his arm to get away. Finally, Detective Flores testified that the victim appeared to be genuinely surprised and upset when he informed her during the interview that the victim had died of his injury.

The State's next witness was Mr. Warren Moran, a friend of the victim since childhood. He testified that he was familiar with the defendant from an earlier time period when she was dating a mutual friend of both him and the victim. Mr. Moran testified that

during the time period the victim and the defendant were seeing each other, he observed many injuries on the victim that the victim told him had come from the defendant. For example, Mr. Moran testified that the victim told him that the defendant had hit him in the head with a brush, causing bruising to his head which a doctor said would blacken his eyes. Mr. Moran testified that, afterward, he saw a soft-ball-sized knot on the victim's head and that the victim had black eyes. Mr. Moran also testified that he saw an injury on the victim's stomach where the defendant had bitten a "plug" of "meat" out of the victim. He testified that this injury left a bad scar on the victim's stomach. Mr. Moran also testified that he saw other injuries on the defendant.

Mr. Moran testified that the relationship between the victim and the defendant began while both the victim and the defendant were living with the mutual friend, whom the defendant was dating. Mr. Moran testified that the victim told him that the defendant crawled into bed with him one morning and accused him of being "gay"; afterward, the two had sex. Mr. Moran testified that the victim wanted to break off the sexual relationship with the defendant because he did not want to hurt his friend's feelings by messing around with his girlfriend, but the defendant did not care. Mr. Moran testified that at some point afterward, the defendant moved into her own apartment. After this period of time, the victim would frequently go to the defendant's apartment and visit her. Mr. Moran testified that both the victim and the defendant smoked marijuana and that he had been present on occasions when the defendant would smoke marijuana.

Mr. Moran testified that he and the victim would typically talk on the phone about eight or nine times a day. Mr. Moran testified that on the early morning hours of October 13, 2007, he received a phone call from the victim, requesting that he call the police. During this phone call, he heard the defendant say "bitch," and the phone dropped. Mr. Moran testified that, afterward, he repeatedly called both the victim and the defendant but received no answer. Mr. Moran testified that a friend of his, Mr. Mike Taylor, was already on his way to the defendant's apartment at the time. Approximately ten minutes later, Mr. Taylor called Mr. Moran and told him that he was at the defendant's apartment and that the victim was dead. Mr. Moran testified that he hurried to the defendant's apartment and saw individuals bringing the victim out. Mr. Moran testified that he knew the victim was dead because he was lying on the stretcher in his boxers with his arm hanging off.

On cross-examination, Mr. Moran admitted that he was very close to the victim and was very angry that the victim was dead. Mr. Moran also testified that the defendant had previously assaulted the mutual friend she was in a relationship with at the time she began having intercourse with the victim. According to Mr. Moran, the defendant hit the mutual friend with her right hand and knocked his eye out, causing him to be permanently blind in that eye. Mr. Moran further testified that the victim wanted to end the relationship with the

defendant but that the defendant prevented him from doing so by blackmailing him, essentially by threatening to tell their mutual friend about the acts of intercourse that had occurred when she was living with the friend in his apartment. This would result in the friend's throwing the victim out of his apartment and leaving the victim homeless. Mr. Moran further testified that the victim did not use cocaine and that he believed the defendant was secretly using cocaine. He testified that the victim had sold marijuana and that the defendant had sold marijuana for him and had been arrested for doing so when she was a juvenile.

The State's next witness was Mr. Mike Taylor, who testified that he was a friend of the victim from high school and was also a friend of the mutual friend that the defendant was dating when she began her relationship with the victim. Mr. Taylor testified that on the night of October 12 going into October 13, 2007, he was going back and forth to the defendant's apartment because the victim was there. He testified that, during the day, he saw the victim, clothed in a T-shirt and boxers, hanging around the house. He testified that he never observed any arguing or fighting between the victim and the defendant while he was at the defendant's apartment. He testified that he was aware that there was marijuana at the apartment and that he had seen the defendant smoke marijuana on prior occasions.

He testified that he left the defendant's apartment that night to buy some apple juice and Raisin Bran for the victim because the victim needed help "using the bathroom." He testified that he used the victim's car on this occasion. Mr. Taylor testified that no fighting or arguing was occurring between the two when he left. He testified that while he was out, he stopped by Mr. Moran's house and then left to go back to visit the victim. He testified that when he arrived back at the defendant's apartment, he had to squeeze through the doorway because the victim was lying near the door on his back. He testified that he saw the defendant sitting on the couch while the victim was lying on the ground with blood everywhere. He testified that he immediately called Mr. Moran and told him to come to the defendant's apartment. He testified that, afterward, he left the apartment because he had an outstanding warrant and did not want to be arrested. He testified that when he left, he believed there was nothing he could do to help the victim because the victim had coughed up blood and was not moving. Mr. Taylor testified that he had seen the victim with injuries on prior occasions, including a bite mark and a big knot on his head. He testified that he had never seen any injuries on the defendant.

On cross-examination, Mr. Taylor testified that he was not aware that the victim ever sold drugs. He testified that on the night of the incident, he was not "rushing over" to the victim's apartment to dispose of any drugs. He testified that when he arrived and saw the victim lying on the floor in a pool of blood, the defendant was sitting on the couch crying and shaking. Mr. Taylor testified that the defendant was not saying anything or screaming. Mr.

Taylor testified that there was another female sitting next to the defendant on the sofa when he arrived.

The State's next witness was Mr. Antwain Burdine, a friend of the victim since middle school. Mr. Burdine also testified that he knew Mr. Moran and Mr. Taylor. Mr. Burdine testified that he knew the defendant from the time period when she was dating the mutual friend that she was living with when she began her relationship with the victim. He testified that on the night in question, his girlfriend woke him up and told him that his sister, who lived next door to the defendant, had called to say that there was noise at the defendant's apartment and that he needed to get over there. When he arrived, he saw a knife outside the door. He testified that he could barely open the door to the defendant's apartment because it was stopped by the victim's body lying on the floor. He testified that he never saw the defendant. Mr. Burdine testified that he tried to help the victim but was told not to touch him. He testified that from the position of the victim's body, it appeared as though he was trying to open the door and had fallen backward.

Mr. Burdine testified that the victim was generally a friendly, silly guy who was good to the defendant and everyone else. He testified that he knew that the victim and the defendant had a couple of fights, but he was unaware that it had been anything serious. He testified that a couple of weeks prior to the incident, he was aware that the victim and the defendant had a fight and that, during this fight, the victim had gotten "his little head busted." He testified that as a result of this incident, the victim's eyes had turned black. He testified that he never saw any bite marks on the defendant or the victim. He testified that he, the victim, and the defendant had all smoked marijuana together on prior occasions.

On cross-examination, Mr. Burdine testified that he had never heard of the victim beating the defendant but had heard about the defendant's beating the victim up on prior occasions. Mr. Burdine estimated that the victim weighed approximately 190 pounds and that the defendant weighed approximately 130 pounds; nonetheless, he stated that he would bet on the defendant in a fight. Mr. Burdine testified that the victim had a lot of medical problems, including asthma, and that he found it difficult to walk without his inhaler. Mr. Burdine also testified that he had heard that the victim and the defendant bit each other and that, according to what he had heard, the victim had been bitten by the defendant and then the victim had bitten her back.

On redirect examination, Mr. Burdine again testified that he would bet on the defendant in a fight between the defendant and the victim. He explained that he had heard that the defendant had gotten into a scuffle with her prior boyfriend and, during this fight, had hit him in the eye, damaging it so badly that he was required to have surgery.

The State's final witness was Darinka Mileusnic-Polchan, the Chief Medical Examiner for Knox and Anderson Counties and the State's forensic pathologist. Dr. Mileusnic-Polchan testified that she performed the autopsy on the victim and concluded that the victim's death was a homicide caused by a stab wound to the upper chest area. She testified that the victim's main injury was a stab wound that appeared to be going from right to left in terms of bodily trajectory. She also testified that there was additional evidence that the victim had suffered a couple of bite marks to the right arm area, as well as some scrapes and injuries to his knees that were probably caused by his body collapsing as he went to the ground. Dr. Mileusnic-Polchan testified that the pattern of blood dripping downward on the body indicated that the victim was most likely standing when he was stabbed. She testified that the blade of the knife entered the victim's chest cavity and went into the inner portion of the lung that connects directly to the heart and contains many major blood vessels, as well as the portion of the victim's body that led to the airway going from the trachea to the lung. She explained that, as a result, blood spilled from the major blood vessels near the lungs into the lungs, causing the victim to drown in his own blood. This conclusion was confirmed by the fact that the victim had spit up considerable amounts of his own blood and by the fact that Dr. Mileusnic-Polchan discovered one and a half liters of blood inside the victim's right lung. Dr. Mileusnic-Polchan testified that, during the autopsy, she also found evidence of additional blunt force trauma to the right side of the victim's face. She went on to give detailed testimony concerning the incision made by the knife when it struck the victim, explaining which portion of that wound was caused by the knife entering the body and which was caused by the knife exiting the body. She testified that she examined a knife given to her by police and that she had determined that this knife was consistent with the wounds inflicted on the victim. She further testified that this knife was covered with subcutaneous tissue and that the blade was smeared with blood and fat from the tip all the way down to the handle.

Considering those wounds and looking at the crime scene photographs, Dr. Mileusnic-Polchan analyzed the blood splatter to determine where the victim was located when he was first stabbed. According to her investigation, the victim could not have been standing up against the door to the apartment when he was stabbed. In addition, because of the amount of blood that would have been spurting from the wound at the time the victim was stabbed, she opined that whoever did the stabbing would have been covered in blood if they had been standing in front of the victim at the time he was stabbed. However, if the person doing the stabbing had stabbed the victim from the side or from behind, then that person might have been able to avoid the blood spray and might not have been covered in blood.

After hearing this opinion, the prosecutor played a portion of the defendant's statement to police in which she claimed that she stabbed the victim from the front in an

effort to stop him from blocking her egress from the apartment. Dr. Mileusnic-Polchan testified that the results of her autopsy were inconsistent with the version of events relayed by the defendant and consistent with the victim having been stabbed from the back or from behind while standing some distance away from the doorway of the apartment.

Dr. Mileusnic-Polchan testified that one of the bite wounds on the victim's body appeared to be fresh and most likely occurred around the time of the stabbing. She testified that she also tested the victim's blood for toxicology. According to the toxicology report, the victim had smoked marijuana at some point several weeks in the past but had not done so within the last two or three days prior to his death. The victim was also tested for various other drugs, including cocaine, and all of those tests were negative. Dr. Mileusnic-Polchan testified that she had determined from an examination of the victim's lungs that the victim suffered from bronchial asthma.

On cross-examination, Dr. Mileusnic-Polchan further testified that although portions of the blood splatter might be consistent with the victim's having stood near the door when he was stabbed, there was blood spray present at too great a distance from the front door for him to have been standing at the front door when he was initially stabbed. She also testified that the victim displayed no defensive wounds of the sort that a forensic pathologist usually finds when an individual sees a knife blow coming and tries to defend himself by grabbing or blocking it. From this she concluded that the victim either did not see the knife coming or that the stabbing happened extremely quickly. Following this testimony, the court asked the witness a question submitted by a juror, inquiring as to whether there was any evidence in the blood splatter that the victim was jumping up and down after having been stabbed as the defendant claimed in her statement to police. The witness testified that she would not expect a person to be jumping up and down after receiving this sort of injury and that there was no evidence in terms of blood splatter that would support the claim that the victim was jumping up and down after he was stabbed.

The defendant took the stand as the only witness in her defense. She testified that she was twenty-three years old, was born in East Knoxville, and had a three-year-old child. The defendant testified that she met the victim through the father of her baby, whom she was living with at the time. The defendant testified that the victim, her then-boyfriend, and her baby all lived together at the same apartment for a period of time. She testified that at some point during the time they were living together, while her then-boyfriend was at work, the relationship between the victim and the defendant became sexual. She testified that she kept this fact hidden from her then-boyfriend because the victim threatened her. She testified that at some point afterward, she moved out of that apartment and into a place of her own. She testified that she was still seeing the victim during the time that she lived in her new apartment. She testified that the victim did not live in the apartment but that he would come

over and visit three or four times a week – essentially coming and going as he pleased. The defendant testified that she loved the victim dearly.

The defendant testified that the victim was a very controlling, jealous, and violent person. She testified that, for example, when they would be in the car and she would glance out the window, the victim would just reach over and punch her. She testified that the victim often came to her house unannounced and made her throw out any friends that happened to be visiting. She testified that she would comply with the victim's requests because she did not want to get hit. She testified that the defendant would hit her, bite her, and punch her all over her body. She testified that the victim controlled everything that she did and that he required her to cook for him, clean, and draw his bath water. She testified that the victim repeatedly referred to her as a "bitch, whore, slut, good for nothing" and accused her of being a bad parent. She testified that sometimes the victim would show up at eleven or twelve at night when she was feeding her baby and would force her to stop feeding her baby and fix him something to eat. She again testified that she complied with his requests because she did not want to get beaten. She testified that she never called 911 to report any of these instances because she did not want to get the victim into trouble. She further testified that she never reported any of these instances to anyone, not even her family, because she was afraid that whoever she told would report the instances to police. She testified that she could overlook all the victim's abusive behavior because she loved him and that the victim was her "everything."

The defendant testified that the victim sold drugs, including marijuana and cocaine. She testified that he kept those drugs in her apartment against her wishes. The defendant further testified that Mr. Taylor sold marijuana and Mr. Burdine sold cocaine. She testified that Mr. Taylor was not at her apartment on the day of the incident.

The defendant testified that she went to work on the night of the incident but was allowed to go home. She testified that the victim was not at her house when she returned but that he returned later that night and was in a bad mood when he arrived. She testified that she asked the victim to leave, but he refused to do so. The defendant testified that she tried to leave the apartment but every time she did, the victim pushed her away from the door and told her she could not go anywhere. The defendant testified that the victim locked her front door and that she was frightened because he would not allow her to leave. She testified that she called 911, and, when she reached the point of describing what the victim was wearing to the 911 operator, the victim took her cell phone away from her and threw it. The defendant testified that the victim then went crazy, punching and beating her in the face and scratching and biting her. She testified that the victim was choking her at one point and that she had to bite him in the arm twice to get him to let go. After she did this, she ran to the kitchen and grabbed the knife. The defendant testified that she just wanted to scare the

victim into moving away from the door so she could get out of the apartment, but her tactic did not work. She testified that the victim continued to block the door, so she stepped out, went forward, and sliced at him. The defendant testified that, afterward, the victim grabbed his chest and staggered backward toward the door. She testified that he managed to unlock the door and then fell to the ground.

The defendant testified that after she stabbed the victim, she was hysterical and ran outside screaming for help. She testified that one of the neighbors told her to drop the knife, and she did so. She testified that she went back into the apartment and tried to assist the victim, while she continued crying and screaming. She testified that she called the police, who eventually responded to the scene. She testified that she did not try to run from the police or hide the weapon. She testified that she never intended to kill or hurt the victim but only wanted to scare him away from the door.

On cross-examination, the defendant testified that the victim, although ostensibly working for the Tennessee Department of Transportation, never actually did any work. He would simply go get his company truck and drive back to the apartment. The defendant testified that the victim actually made his living selling drugs out of two different cars. The defendant testified that the victim sold both marijuana and cocaine and would keep these drugs at her house. However, the defendant acknowledged that the marijuana and cocaine the police found in her apartment were found in single bags and were not separated out into smaller bags.

Upon being questioned as to why the keys to the victim's car were found in her possession on the night of the incident, she claimed that she picked the keys up off of the table after she stabbed the victim. The defendant acknowledged that neither the keys nor her hands had any blood on them. The victim's car keys were admitted into evidence thereafter. The prosecution also questioned the defendant about whether she had threatened the victim with a smaller paring knife prior to the stabbing. The defendant admitted doing so but said that she threw the knife away when the victim saw her with it. The defendant claimed that, afterward, the victim started beating her up for it. The defendant also acknowledged that although she had testified that the victim had hit her all over her body on the night of the incident, she did not have any marks on her nose, lips, ears, or eyes and only had a single mark on her face from the alleged beating.

The defendant further testified that although she did not want the defendant to keep cocaine or marijuana in the apartment, she never called the police concerning the drugs and that, when she called 911 to have the victim removed from her apartment on the night in question, she never reported being assaulted, never reported threatening him with a knife, and never mentioned that the victim had drugs in the apartment. The defendant also admitted that

-11-

she smoked marijuana and that there was a cigarillo wrapper found on the table in the living room that was intended to be used as a "blunt" for smoking marijuana.

The defendant further claimed that she had not actually stabbed the victim. Rather, she claimed that she merely slashed out toward him. She denied that she had plunged the entire length of the knife into the victim's chest and claimed that the forensic examiner was wrong in her description of the victim's stab wounds. When the prosecution confronted the defendant with her earlier statement to police to the effect that she was angry at the defendant on the night in question, rather than afraid of him, the defendant denied that this was true but gave no explanation for why she had made this earlier statement to police.

Following this testimony, the defense rested, and the court instructed the jury. The jury retired at 4:06 p.m. on June 15, 2010, and deliberated until 6:50 p.m. that day. They recessed for the evening, returned the following day, and deliberated from 8:50 a.m. until 10:51 a.m. The jury returned with a verdict of not guilty as to the count of second-degree murder but guilty of the lesser included offense of voluntary manslaughter.

The defendant was sentenced on August 6, 2010. The sentencing court took testimony from a number of witnesses related to the victim – including his mother, father, aunt, and grandmother – each of whom testified as to the tremendously negative impact they had suffered as a result of the defendant's conduct. The defendant also made a brief statement expressing remorse for her actions.

After considering this testimony, the defendant's presentence report, and other relevant sentencing principles, the trial court sentenced the defendant as a Range I, standard offender, guilty of a Class C felony, to the maximum of six years, split one-year confinement with the remainder to be served on probation. The court found two enhancement factors to be applicable: the defendant's prior drug use (which she admitted at trial and in her presentence report) and the fact that the defendant employed a deadly weapon during the commission of the offense. The sentencing court found the former factor to be of very little weight. The sentencing court rejected the defendant's proffered mitigating factors: that the defendant acted under strong provocation and that the offense was committed under extremely unusual circumstances, finding that her claim to have acted under extreme duress had already been taken into account by the jury when it found her guilty only of the lesser included offense of voluntary manslaughter. The court concluded that the nature of the crime itself, more than any particular enhancing or mitigating factors, called for the particular sentence imposed. The sentencing court considered this case to be a simple domestic argument that resulted in a homicide and felt that any sentence imposed should stress that individuals cannot take the lives of their partners simply because they are angry or choose to settle their differences with pistols and knives. The sentencing court explained that this

victim's family lost a beloved family member for no good reason.

The defendant filed a motion for new trial on August 16, 2010, claiming that the evidence was insufficient to support a conviction and that the sentence imposed was excessive. The trial court denied that motion after a hearing held on September 23, 2010. On October 18, 2010, the defendant filed a timely notice of appeal. This appeal promptly followed.

## ANALYSIS

The defendant claims that the evidence is insufficient to support her conviction and that the sentence imposed is excessive. After carefully reviewing the record and the arguments of the parties, we reject both claims for the reasons that follow.

### I.

"When there is a challenge to the sufficiency of the evidence, the relevant question is whether, after reviewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *State v. Sisk*, 343 S.W.3d 60, 65 (Tenn. 2011). "'Because a verdict of guilt removes the presumption of innocence and raises a presumption of guilt, the criminal defendant bears the burden on appeal of showing that the evidence was legally insufficient to sustain a guilty verdict.'" *Id.* (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)). When conducting this inquiry, it is well established that the State is to be accorded the strongest legitimate view of the evidence and that all conflicts between the evidence and any reasonable inferences to be drawn therefrom must be resolved in favor of the State. *See id.* The trier of fact is generally entrusted to assess the credibility of witnesses and resolve any conflicts in the proof, and a jury's decisions in these regards will not be revisited on appeal. *See id.*

In this case, the essential elements at issue are those of voluntary manslaughter as defined in Tennessee Code Annotated section 39-13-211. Voluntary manslaughter is "the intentional or knowing killing of another in a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner." *See* T.C.A. §39-13-211(a) (2007). There is no dispute that the defendant struck the victim with a knife and thereby caused his death. Rather, the defendant urges that she did not intentionally kill the victim when she slashed out with a knife. She urges that her own testimony and statement to police are sufficient to establish that "the State proved, at best, reckless homicide on a beyond a reasonable doubt basis."

By finding the defendant not guilty of second degree murder but, rather, only voluntary manslaughter, it is clear that the jury credited portions of the defendant's testimony concerning the abuse she suffered at the hands of the victim. Specifically, the jury necessarily found that the victim provoked the defendant and that this provocation was sufficient to lead a reasonable person to act irrationally. However, the jury was not required to credit all of the defendant's testimony simply because it credited a portion of it. Where the defendant's evidence – consisting solely of her own testimony – conflicted with the testimony of other witnesses and forensic evidence, the jury was free to resolve some discrepancies in favor of the defendant and some in favor of the State.

The State presented considerable evidence at trial that would support a conclusion that the defendant knowingly killed the victim. The State's forensic examiner testified that the eight-inch blade of the knife used by the defendant was covered in the victim's blood, fat, and tissue along its entire length and that the wound to the defendant went deep into his chest and lungs. This testimony readily supports a jury conclusion that the defendant plunged the knife all the way into the victim's chest, all the way to the knife's hilt. This plainly contradicts the defendant's testimony at trial that she simply slashed out with the knife and did not intend to make contact with the victim. The jury was free to credit the State's forensic evidence and reject the defendant's testimony on the specific issue of whether the defendant stabbed the victim as deeply as the knife would permit. The jury was free to conclude that the defendant would have necessarily been aware that stabbing the victim deeply in the chest with a large knife was reasonably certain to lead to his death.

The defendant's version of events (as described in her testimony) in which she describes herself as merely slashing out in the general direction of the victim and never intending to stab him also stands in stark contradiction with considerable other circumstantial evidence that was presented in the case. The forensic examiner testified that the victim's body could not have been positioned in a manner barring the victim's egress from the apartment, as the victim testified. The lack of any defensive wounds on the victim's arms and hands strongly suggest that he never saw the killing blow coming. The lack of any blood on the defendant strongly suggests that she stabbed him from the back or the side, not the front.

Moreover, in her initial statement to police, the defendant described the killing blow to the defendant as a "stab," not a "slash." The defendant also discussed how angry she was with the defendant on the night in question because of things he had said and names he had called her during their argument. Numerous other discrepancies exist between the defendant's statement to police immediately following the incident and her testimony on the stand. Under these circumstances, a reasonable jury was free to credit the testimony of the State's medical examiner and the defendant's earlier statement to police over those portions

-14-

of the defendant's testimony at trial concerning how the victim's injury was sustained. Viewed in the light most favorable to the State, the evidence establishes all of the elements of voluntary manslaughter beyond a reasonable doubt.

## II.

The defendant urges that the trial court erred by imposing a six-year sentence, with one year to be served in incarceration. On appeal, we review a trial court's sentencing decision *de novo* with a presumption that its determinations are correct. T.C.A. § 40-35-401(d). This presumption of correctness is conditioned upon the affirmative showing that the trial court considered the relevant facts, circumstances, and sentencing principles. *State v. Ashby*, 823 S.W.2d 166, 169 (Tenn. 1991). A "trial court is free to select any sentence within the applicable [sentencing] range so long as the length of the sentence is 'consistent with the purposes and principles of [the Sentencing Act].'" *State v. Carter*, 254 S.W.3d 335, 343 (Tenn. 2008) (*quoting* T.C.A. § 40-35-210(d)). The burden is on the appealing party to show that the sentence is improper. *See* T.C.A. § 40-35-401(d). Here, the defendant has not met that burden.

There is no dispute that the sentence imposed by the trial court was within the applicable sentencing range. The parties agree that the defendant was a Range I, standard offender. Moreover, "[v]oluntary manslaughter is a Class C felony." T.C.A. §39-13-211(b). The sentencing range for a Range I offender committing a Class C felony is three to six years. *See* T.C.A. § 40-35-101. The trial court was free to select any sentence in this range that was consistent with the principles and purposes of the Sentencing Act.

The defendant claims that the trial court erred by rejecting the mitigating factors proffered by the defendant, *viz.*, that she acted under strong provocation, expressed genuine remorse for her actions, had a strong work record, and was an excellent mother. Reviewing the record as a whole, we believe the trial court considered all the appropriate facts, circumstances, and sentencing principles, and therefore presume that the trial court was correct in its factual determination that none of these alleged mitigating factors were present.

The defendant especially urges this court to conclude that the trial court erred by refusing to find as a mitigating factor the fact that the defendant acted under strong provocation. We concur with the trial court that this alleged mitigating factor was already taken into account in determining the defendant's degree of culpability at the guilt stage of the defendant's trial, as it is an express element of the offense of which she was found guilty. To give additional weight to this factor at sentencing would be to use the same facts both to determine the defendant's degree of culpability and the severity of her sentence – a practice generally prohibited when the factor at issue is an enhancing rather than a mitigating factor.

*See, e.g.*, *State v. Lavender,* 967 S.W.2d 803, 807 (Tenn. 1998) ("If the facts which establish the elements of the offense charged also establish the enhancement factor, then the enhancement factor may not be used to increase punishment."). Whether the general prohibition against using the same facts to establish both the degree of the defendant's offense and the degree of the defendant's punishment applies with equal force to mitigating factors, on the facts of this case we can discern no error in the trial court's decision not to "double count" the provocation caused by the victim. The sentence imposed by the trial court is therefore affirmed.

## CONCLUSION

For the foregoing reasons, the judgment of the trial court is affirmed.

_____
JOHN EVERETT WILLIAMS, JUDGE