IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs December 11, 2013

**STATE OF TENNESSEE v. MICHAEL WISS**

**Appeal from the Circuit Court for Maury County**
**No. 21241      Jim T. Hamilton, Judge**

---

**No. M2012-01547-CCA-R3-CD - Filed March 26, 2014**

---

In 2011, the Maury County Grand Jury indicted Appellant, Michael Wiss, for harassment by the electronic phone communication of text messaging. A jury convicted Appellant of harassment. He was then sentenced to eleven months and twenty-nine days and ordered to pay a $2500 fine. On appeal, Appellant argues that the evidence presented by the State at trial was insufficient to support his conviction. After a thorough review of the record, we affirm the judgment of the trial court and conclude that the evidence was sufficient to support Appellant's conviction.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Trial Court is Affirmed.**

JERRY L. SMITH, J., delivered the opinion of the court, in which ALAN E. GLENN and CAMILLE MCMULLEN, JJ., joined.

Ronald G. Freemon, Columbia, Tennessee, for the appellant, Michael Wiss.

Robert E. Cooper, Jr., Attorney General and Reporter; Caitlin E.D. Smith, Assistant Attorney General; and Mike Bottoms, District Attorney General, for the appellee, State of Tennessee.

**OPINION**

*Factual Background*

In late June 2011, Cassie Gidcomb received a number of text messages and phone calls from Appellant. Ms. Gidcomb and Appellant had been romantically involved intermittently from 2007 to 2011, but they had parted ways prior to the incidents at hand.

The relationship was strained because Ms. Gidcomb and Appellant shared custody of their then six-year-old daughter, S.W.[1]

In June, Ms. Gidcomb, accompanied by her brother-in-law, Joshua Fullagar, and his sister, took a trip to New York to visit Mr. Fullagar's family. Ms. Gidcomb elected not to take her daughter with her on the trip and agreed beforehand to allow Appellant to visit their daughter even though it was not his scheduled weekend for visitation. However, Appellant did not pick up their daughter before Ms. Gidcomb left for her trip, so she asked her mother, Bee Gidcomb, to care for S.W. instead.

The following day, after Ms. Gidcomb had already left on her trip, Appellant called Ms. Gidcomb and inquired about his scheduled visitation with their daughter. Ms. Gidcomb revealed that she left S.W. with her mother because Appellant did not call or show up to retrieve his daughter.

Throughout her visit to New York and while she was returning home, Ms. Gidcomb received repeated text messages and phone calls from Appellant because he was unhappy about Ms. Gidcomb's decision to leave their daughter with her mother instead of him. Because Ms. Gidcomb refused to answer the text messages and phone calls, they began to accumulate rapidly.

The majority of the text messages and phone calls were received between 12:00 a.m. and 3:00 a.m. on the evening of June 25, 2011, while Ms. Gidcomb and her companions were in New York. The content of the messages consisted of Appellant threatening Ms. Gidcomb's mother's life and even implying that she had already been killed; that Appellant or others were outside of Ms. Gidcomb's home, where Ms. Gidcomb resided with her mother, her daughter, and her son; and that Appellant hoped that Ms. Gidcomb's son was not in her home because Appellant did not want the son to be hurt mistakenly.

One message stated, "Feeling good to do it, so stop ignoring me or no one is going to be able to identify what's left of you. Think I'm playing? If I don't have [our daughter] by 12:00, I'm gonna." Another message singled out Ms. Gidcomb's mother, "Why do you keep hanging up? You playing. I'm about to put you momma under for good. I don't care." Appellant continued his intimidation by targeting Ms. Gidcomb's son with the following message, "Is [Ms. Gidcomb's son] there? This is very important [Ms. Gidcomb]. He doesn't need to get hurt. I need to know to let them know I'm about to go have some drinks. I need want [sic] the kids to get hurt." Finally, Appellant tried to convince Ms. Gidcomb that her mother had been killed when he sent, "Your road is blocked off and if they miss the hit they

_____

[1] It is the policy of this Court to refer to minors by their initials.

will be back, but I've been assured she is gone and your only concern is S.W." The appellant followed minutes later with "Okay [Ms. Gidcomb]. I'm sorry. I'm going to pray for your family. We are all sorry for your loss. Guess you will get the call in the morning. Faith is the tool of God. I'm sorry this happened."

Ms. Gidcomb recounted, as well as Mr. Fullagar, that she was worried for her family's safety while receiving the messages and spent the majority of the night in tears. Mr. Fullagar confirmed that Ms. Gidcomb was distressed. Ms. Gidcomb preserved as many messages as she could for evidence. Mr. Fullagar also recollected the threatening content of the phone calls. Additionally, he identified Appellant as the speaker when Ms. Gidcomb put the calls on speakerphone.

Appellant finally ceased messaging a little past 3:00 a.m., but then commenced again the next afternoon by sending, "You get back, you think getting raped fucked your head up. You ain't seen shit. And tell that digger [sic] wannabe I got a chopper with a fifty round clip to shut that ass up." During this time, Ms. Gidcomb had great difficulty reaching her family due to the rural location of their home.

Due to the number of messages received, Ms. Gidcomb had to store messages in Mr. Fullagar's email account so that she could receive incoming messages from Appellant. Ms. Gidcomb testified that she received approximately fifty to one hundred threatening messages throughout the duration of her trip to New York.

The correspondence was so troubling that Ms. Gidcomb, Mr. Fullagar, and his sister decided to shorten their trip and return to Tennessee. Upon returning home, Ms. Gidcomb, Mr. Fullagar, and Mr. Fullagar's sister drove immediately to Ms. Gidcomb's home. After arriving and verifying that her family was safe, Ms. Gidcomb filed a report with the sheriff's office and then went to speak with the Magistrate. Ms. Gidcomb continued to receive telephone calls and text messages from Appellant during this time.

The following day, Ms. Tiara Baxter, a close friend of Ms. Gidcomb, testified that she saw Ms. Gidcomb ignore many phone calls and receive threatening text messages from Appellant's phone number. Appellant's communications continued. In the weeks leading up to trial, on more than one occasion, Appellant's mother called Ms. Gidcomb without notifying her that Appellant was also on the call as they attempted to convince Ms. Gidcomb to "drop" the charges.

On November 10, 2011, an indictment was returned charging Appellant with unlawfully and intentionally communicating in violation of Tennessee Code Annotated Section 39-17-308 for the incidents on or about June 25, 2011 through July 1, 2011. On June

14, 2012, a jury returned a verdict finding Appellant guilty of harassment, a Class A misdemeanor, pursuant to Tennessee Code Annotated section 39-17-308. The judge sentenced Appellant to eleven months and twenty-nine days and ordered a $2,500 fine.

Appellant's motion for a new trial was denied. He filed a timely notice of appeal.

## ANALYSIS

Appellant challenges the sufficiency of the evidence supporting his harassment conviction. Specifically, the Appellant believes that the State failed to prove every element of the crime for which he was convicted. The State contends that the evidence was sufficient to convict Appellant of harassment and that this Court should affirm the judgment of the trial court.

When a defendant challenges the sufficiency of the evidence, this Court is obliged to review that claim according to certain well-settled principles. A verdict of guilty, rendered by a jury and "approved by the trial judge, accredits the testimony of the" State's witnesses and resolves all conflicts in the testimony in favor of the State. *State v. Cazes*, 875 S.W.2d 253, 259 (Tenn. 1994) (citing *State v. Harris*, 839 S.W.2d 54, 75 (Tenn. 1992)). Thus, although the accused is originally cloaked with a presumption of innocence, the jury verdict of guilty removes this presumption "and replaces it with one of guilt." *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). Hence, on appeal, the burden of proof rests with the defendant to demonstrate the insufficiency of the convicting evidence. *Id.* The relevant question the reviewing court must answer is whether any rational trier of fact could have found the accused guilty of every element of the offense beyond a reasonable doubt. *See* Tenn. R. App. P. 13(e); *Harris*, 839 S.W.2d at 75. In making this decision, we are to accord the State "the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences that may be drawn therefrom." *See Tuggle*, 639 S.W.2d at 914. As such, this Court is precluded from re-weighing or reconsidering the evidence when evaluating the convicting proof. *State v. Morgan*, 929 S.W.2d 380, 383 (Tenn. Crim. App. 1996); *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Moreover, we may not substitute our own "inferences for those drawn by the trier of fact from circumstantial evidence." *Matthews*, 805 S.W.2d at 779. Further, questions concerning the credibility of the witnesses and the weight and value to be given to evidence, as well as all factual issues raised by such evidence, are resolved by the trier of fact and not the appellate courts. *State v. Pruett*, 788 S.W.2d 559, 561 (Tenn. 1990). "The standard of review 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

In this case, Appellant was convicted of harassment. At the time of the incident, harassment was defined as the following:

(a) A person commits [an] offense who intentionally:

(1) Threatens, by telephone, in writing or by electronic communication, including, but not limited to, text messaging, facsimile transmissions, electronic mail or Internet services, to take action known to be unlawful against any person and by this action knowingly alarms the recipient;

. . . .

(4) Communicates with another person by any method described in subdivision (a)(1) without legitimate purpose:

(A)(i) With the malicious intent to frighten, intimidate or cause emotional distress; or

(ii) In a manner the defendant knows, or reasonably should have known, would frighten, intimidate or cause emotional distress to a similarly situated person of reasonable sensibilities; and

(B) As the result of the communication, the person is frightened, intimidated, or emotionally distressed.

T.C.A.§ 39-17-308(a)(1), (4).

When viewing the evidence in a light most favorable to the State, it is clear that the text messages sent to and preserved by Ms. Gidcomb were the means of communication used by Appellant. The context of and frequency of the text messages and phone calls demonstrate an intentional and non-inadvertent nature. These intentional communications sent by Appellant were threats of illegal actions including, but not limited to, murder, arson, kidnapping, conspiracy, and assault against Ms. Gidcomb's family. Therefore, there was no legitimate purpose for the communication.

The hostile context of the communications threatening to kill her mother and children if he was not permitted to see their daughter conveyed Appellant's intent to frighten or intimidate Ms. Gidcomb. Additionally, Appellant knew, or reasonably should have known, such communications would frighten or cause emotional distress upon a similarly situated person as Ms. Gidcomb. Finally, witness testimony accredited by the jury divulges that Ms.

Gidcomb was truly frightened and intimidated as evidenced by her panicked reactions and ensuing decision to abandon her trip early to confirm her family's well being.

There was ample evidence presented for any rational juror to conclude beyond a reasonable doubt that Appellant did unlawfully and intentionally communicate with Ms. Gidcomb through text messages.

This issue is without merit.

## <u>CONCLUSION</u>

Based on the foregoing reasons and authority, the judgment of the trial court is affirmed.

_____
JERRY L. SMITH, JUDGE