IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs January 17, 2018

## STATE OF TENNESSEE v. KORTNEY BALL

**Appeal from the Circuit Court for Rutherford County
No. F-76526 David M. Bragg, Judge**

---

## No. M2017-01436-CCA-R3-CD

---

Defendant was convicted by a Rutherford County Jury of driving under the influence ("DUI"), retaliation for past action, assault, and resisting arrest. The trial court sentenced Defendant to an effective sentence of two years, of which Defendant was ordered to serve six months in incarceration and the balance of the sentence on supervised probation. Defendant appeals his conviction for retaliation for past action, arguing that the evidence was insufficient to support the conviction. For the following reasons, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

TIMOTHY L. EASTER, J., delivered the opinion of the court, in which THOMAS T. WOODALL, P.J., and ROBERT L. HOLLOWAY, JR., J., joined.

Gerald L. Melton, District Public Defender, and Billie I. Zimmerman, Assistant District Public Defender, for the appellant, Kortney Ball.

Herbert H. Slatery III, Attorney General and Reporter; Renee W. Turner, Senior Counsel; Jennings H. Jones, District Attorney General; and Brent Pierce, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

In November of 2016, the Rutherford County Grand Jury indicted Defendant for DUI, retaliation for past action, assault, and resisting arrest as a result of his actions during a traffic stop on the evening of February 10, 2016.

At trial, Detective Jonathan Brown testified that he was working patrol as a detective for the Murfreesboro Police Department on the night of February 10, 2016. It was snowing that night, which caused "the roads to be slicker." Detective Brown was driving down North Rutherford Boulevard when he observed a black vehicle "trying to change lanes." The vehicle "started moving over into the left lane, and then corrected back over to the right lane" before it "drove down the center striped line for just a short period, and then moved over to the left side." Detective Brown engaged the video camera in his patrol car because the way the driver maneuvered the vehicle through traffic indicated possible "signs of impairment." The vehicle never used the blinker to indicate a lane change and, once in the left lane, began to accelerate, traveling at speeds "going well over 45" in a forty mile per hour zone. The vehicle eventually crossed back into the right lane and turned onto Main Street, again without using a blinker. Detective Brown followed the vehicle onto Main Street and observed the vehicle "drift over into that oncoming traffic lane, and then . . . make a right turn, and then . . . come to a complete stop in the middle of the road." At that point, Detective Brown "lit him up," turning on his blue lights. Detective Brown also observed that the "tag light on the rear was blown out."

After announcing the location of the traffic stop to dispatch over the radio and requesting backup support, Detective Brown exited his patrol car and approached the vehicle on the driver's side. Defendant was sitting in the driver's seat, and the vehicle also contained a female passenger. Defendant "rolled his window down just a little bit" and Detective Brown observed a "strong smell of intoxicant emitting" from the vehicle. Defendant had "slurred speech" and "bloodshot, watery eyes." Defendant continually reached down beside the door with his left hand while he was talking to Detective Brown.

Initially, Defendant was "polite and friendly." Detective Brown asked Defendant for his driver's license, registration, and proof of insurance. Defendant handed the officer his driver's license and insurance but had a "hard time" locating the registration, eventually handing Detective Brown a piece of paper that was not the registration. Defendant continued to reach down beside the driver's door with his left hand, a motion described by Detective Brown as a "furtive movement." When Detective Brown informed Defendant that the paper was not the registration, Defendant reached up and "snatched" the paper out of the officer's hand. Detective Brown was afraid that Defendant might try to "flee," so Detective Brown asked Defendant to exit the vehicle. Defendant stepped out of the vehicle onto the road.

Detective Brown described Defendant as "unsteady on his feet." Defendant started to walk toward the officer with papers in his hand. Detective Brown told him to leave the papers in the vehicle. Defendant did not listen, so the officer told him to place

- 2 -

the papers on the trunk. Defendant complied before he walked back up toward the front of the vehicle to get another piece of paper from the passenger.

Defendant again approached Detective Brown. Defendant kept putting his hands inside his pockets. Detective Brown repeatedly asked Defendant to take them out. Defendant explained to the officer that it was cold outside so he needed to put his hands in his pockets. Detective Brown explained that he was uncertain what, if anything, Defendant had in his pockets and that he asked Defendant to take his hands out of his pockets for safety reasons. Defendant denied having anything "illegal" on his person. Defendant asked Detective Brown if he wanted to search him, lifting his shirt up in the process as if to show the officer that he did not have anything on his person. Detective Brown initiated a search of Defendant by asking him to interlock his fingers behind his head and spread his feet. Detective Brown asked Defendant multiple times to comply with his requests. Defendant became "agitated," and Detective Brown told him to "calm down, just calm down."

When the search was concluded, Defendant took a "step back" away from Detective Brown, who instructed Defendant to "stop." Defendant took a "bigger step back." Detective Brown thought at that point that Defendant was going to run so he "reached up to grab [Defendant's] left hand." Defendant "spun" around with Detective Brown, tried to "square his shoulders," and "ball[ed] up his fist at one point." Detective Brown interpreted these movements as "aggressive," so he broke contact with Defendant and ordered him to the ground.

Defendant started to roll up one of his sleeves and told Detective Brown that he "better not play" with him. Detective Brown perceived Defendant's statements as a threat, pulled out his Taser,[1] and warned Defendant by saying "Taser, Taser, Taser." Detective Brown fired his Taser toward Defendant. The Taser had no effect; Defendant "took the [Taser] barbs and swatted them away." At that point, Defendant walked back toward the vehicle. Defendant turned back toward Detective Brown. The officer again ordered Defendant to the ground. Defendant refused. Detective Brown deployed a second Taser at Defendant; Defendant again swatted the Taser away. Detective Brown notified dispatch that the Taser had been deployed twice and that it had no effect on Defendant.

The videotape from the dash of the patrol car showed the passenger of the vehicle, later identified as Denicia Bah, get out of the vehicle and yell at Defendant to comply

---

[1] In the transcript, the weapon is referred to as a "tazer." The Taser® is actually a trademarked brand of electronic control devices made and distributed by a company called Axon. Axon, http://www.axon.com (last visited January 29, 2018). Thus, we will refer to the weapon as a Taser throughout the opinion.

with Detective Brown. Defendant yelled something incomprehensible at Detective Brown before charging toward him. The remainder of the scuffle between the two takes place off-camera, but the audio picks up the fight. Detective Brown testified that he took a "fighting stance," got his baton in his hand, and deployed the baton. While he was deploying the baton, Defendant struck Detective Brown in the head with his fist. Defendant continued to "attack" Detective Brown, "swinging with both hands." Detective Brown was able to make contact with the baton, issuing several "baton strikes" to Defendant. Detective Brown was aware that he was losing the fight and was afraid that Defendant might gain possession of the baton, so Detective Brown threw the baton to "get it out of the fight." By that time, Defendant had struck Detective Brown "[m]ultiple" times. Detective Brown attempted to retreat, telling Defendant to "stop." Defendant continued to hit him "everywhere." Detective Brown was "dizzy" from the repeated blows.

Eventually, Detective Brown was able to catch Defendant off balance. The men fell to the ground and Detective Brown got on top of Defendant for a few moments. Defendant reached up and tried to grab the officer's holster. Detective Brown was able to pin Defendant down until backup arrived and secured Defendant. Detective Brown was immediately hit with "exhaustion" and had a hard time standing up. An ambulance arrived on the scene and transported Detective Brown to the hospital. When Detective Brown removed his bullet proof vest, he could see multiple bruises. The examination at the hospital revealed bruised ribs, a possible concussion, and abnormally high blood pressure.

Officer Blake Troutman, one of the officers who responded to the request for backup, found Detective Brown and Defendant in a ditch. Detective Brown looked exhausted so Officer Troutman placed Defendant in handcuffs. Defendant was combative, so he was placed inside of Officer Seth Jackson's patrol car with bars between the front and back seat. Once inside Officer Jackson's car, Defendant cursed and screamed repeatedly. The cursing and screaming continued during the drive to the police station and when Defendant was taken out of the patrol car into the station. Many of Defendant's rants were incomprehensible but included many curse words.

Once inside the police station, Officer Troutman asked Defendant if he would submit to a blood test. Defendant said, "f--- you" to Officer Troutman. Officer Troutman "assume[d] that's a no." Defendant replied, "f--- you, whitey, take these mother f---ing handcuffs off, and I'll kill you." At that point, Officer Troutman considered Defendant's actions to be a refusal to submit to the blood test. Officer Troutman felt threatened by Defendant's statements.

- 4 -

Defendant testified at trial that he worked on the night prior to the traffic stop and had been at home prior to driving around with his passenger, Ms. Bah. Defendant claimed that he was on his way home when he saw the blue lights. Defendant turned right onto a street to get out of the officer's way.

At the conclusion of the proof, the jury found Defendant guilty of DUI, retaliation for past action, assault, and resisting arrest. Defendant was sentenced to eleven months and twenty-nine days for DUI, two years for retaliation for past action, eleven months and twenty-nine days for assault, and six months for resisting arrest. Defendant was ordered to serve six months in incarceration and the balance of the sentence on supervised probation.

After the denial of a motion for new trial, Defendant appealed.

*Analysis*

On appeal, Defendant challenges the sufficiency of the evidence with respect to his conviction for retaliation for past action.[2] Specifically, he argues that because the jury asked for the identity of the victim of the crime during deliberations, and the trial judge gave them the indictment naming Officer Troutman as the victim to answer their question, they were "only able to make a determination as to the alleged victim of the charge after receiving the indictment." The State, on the other hand, insists the evidence was sufficient to support the conviction.

When a defendant challenges the sufficiency of the evidence, this Court is obliged to review that claim according to certain well-settled principles. A guilty verdict removes the presumption of innocence and replaces it with a presumption of guilt. *State v. Evans*, 838 S.W.2d 185, 191 (Tenn. 1992) (citing *State v. Grace*, 493 S.W.2d 474, 476 (Tenn. 1973)). The burden is then shifted to the defendant on appeal to demonstrate why the evidence is insufficient to support the conviction. *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). The relevant question the reviewing court must answer is whether any rational trier of fact could have found the accused guilty of every element of the offense beyond a reasonable doubt. *See* Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). On appeal, "the State is entitled to the strongest legitimate view of the evidence and to all reasonable and legitimate inferences that may be drawn therefrom." *State v. Elkins*, 102 S.W.3d 578, 581 (Tenn. 2003). As such, this Court is precluded from re-weighing or reconsidering the evidence when evaluating the convicting proof. *State v. Morgan*, 929 S.W.2d 380, 383 (Tenn. Crim. App. 1996); *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Moreover, we may not substitute our own

---

[2] Defendant does not challenge the remainder of his convictions or his sentences.

"inferences for those drawn by the trier of fact from circumstantial evidence." *Matthews*, 805 S.W.2d at 779. Further, questions concerning the credibility of the witnesses and the weight and value to be given to evidence, as well as all factual issues raised by such evidence, are resolved by the trier of fact and not the appellate courts. *State v. Pruett*, 788 S.W.2d 559, 561 (Tenn. 1990). "The standard of review 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

Retaliation for past action is committed when a "person . . . harms or threatens to harm . . . a law enforcement officer . . . by any unlawful act in retaliation for anything the . . . law enforcement officer . . . did in an official capacity as . . . a law enforcement officer . . . ." T.C.A. § 39-16-510. It is punishable as a Class E felony. *Id.*

The proof in the light most favorable to the State shows that Defendant assaulted Detective Brown during a traffic stop, remained belligerent and combative during his transport to the police station, and verbally threatened Officer Troutman during booking. Defendant argues that nothing corroborated Officer Troutman's testimony, but the jury clearly chose to believe the officer's testimony, as was its prerogative. *See State v. Pappas*, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). Moreover, a victim's testimony alone is sufficient, requiring no corroboration. *See State v. Smith*, 42 S.W.3d 101, 106 (Tenn. Crim. App. 2001).

In fact, Defendant does not deny that he threatened Officer Troutman but merely argues that the jury was unable to reach a verdict until it was given the indictment by the trial court. During deliberation, the jury asked a question of the trial court. Specifically, the jury asked the trial court to identify the victim of the retaliation. At the time the jury asked the question, the trial court realized that the jury was not given a copy of the indictment. The trial court responded by giving the jury a copy of the indictment. *See* Tenn. R. Civ. P. 30(c) ("In the trial of all felonies . . . every word of the judge's instructions shall be reduced to writing before being given to the jury. . . and taken to the jury room by the jury when it retires to deliberate. The jury shall have possession of the written charge during its deliberations. . . ."). The indictment, which was also read to the jury at the beginning of the trial, listed Officer Troutman as the victim. The proof showed that Officer Troutman handcuffed Defendant at the scene. At the police station, Officer Troutman asked Defendant to submit to a blood test. The Defendant responded by threatening Officer Troutman, telling him to take the handcuffs off and "I will kill you." The jury heard the evidence presented at trial and determined that it was sufficient to convict Defendant of retaliation for past action against Officer Troutman for Officer Troutman's handcuffing of Defendant at the scene and Defendant's subsequent unlawful act of threatening to kill Officer Troutman. Defendant has not met his burden of

demonstrating how the evidence is insufficient to support his conviction and is not entitled to relief on this issue.

*Conclusion*

For the foregoing reasons, the judgments of the trial court are affirmed.

_____

TIMOTHY L. EASTER, JUDGE