IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
May 2, 2018 Session

## STATE OF TENNESSEE v. MARK LONDON

**Appeal from the Circuit Court for Obion County**
**No. CC-15-CR-139       Jeff Parham, Judge**

———————————————————

### No. W2017-01396-CCA-R3-CD

———————————————————

Defendant, Mark London, was convicted by an Obion County jury of aggravated assault and simple assault. At sentencing, the trial court merged the convictions, sentencing Defendant to one count of aggravated assault for three years as a Range I, standard offender. Defendant appeals his conviction, alleging that the evidence was insufficient. Because we determine that the evidence was sufficient to support the conviction, the judgment of the trial court is affirmed.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

TIMOTHY L. EASTER, J., delivered the opinion of the court, in which ALAN E. GLENN and J. ROSS DYER, JJ., joined.

Joseph P. Atnip, District Public Defender (on appeal); and James Powell (at trial), Union City, Tennessee, for the appellant, Mark Ray London.

Herbert H. Slatery III, Attorney General and Reporter; Ronald L. Coleman, Assistant Attorney General; Tommy A. Thomas, District Attorney General; and Jim T. Cannon, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

Defendant was indicted by the Obion County Grand Jury in October of 2015 in Count One for aggravated assault which resulted in serious bodily injury and in Count Two for aggravated assault involving the use or display of a deadly weapon. The following proof was presented at trial.

Jason Coleman, the forty-two-year-old victim, was in a relationship with Shelley Tidwell for "[q]uite a few years." The relationship ended about a year before this incident. The fact that Ms. Tidwell "didn't work" contributed to the demise of the relationship. The victim complained that Ms. Tidwell "took $1,000 off [his] debit card without [his] consent and bought a washer and dryer. . . ." She paid all but $300 of the money back.

On August 28, 2015, the victim went to Ms. Tidwell's house during the afternoon in order to find out when or if she was going to pay back the $300. She would not talk to the victim and asked him to leave. The victim went to his parents' house and stayed until about 7:00 p.m. From his parents' house, the victim went to the Bottoms Up bar to have "two beers" and play "some pool." While he was at the bar, his debit card "quit working" so he was unable to pay for the beer.

The victim left Bottoms Up and drove back to Ms. Tidwell's house, again trying to get his money back. The victim had called her on the phone "quite a few times." Ms. Tidwell would pick up the phone but would not answer and would not speak before hanging up on the victim. When he arrived this time, Ms. Tidwell was outside. The victim "stepped out of [his] truck to confront her about the rest of the money" when Defendant "got out of his truck with a ball bat, [and] swung for [his] head." The victim put his arm up to block the bat, and the bat made contact with his arm, breaking his ulna. The victim "went for" Defendant, who took off running to the neighbor's yard. Ms. Tidwell asked the victim to leave and he complied.

The victim went to the hospital that night. Doctors "reset the bone" in his arm, reset two fingers, and put his arm in a cast. He wore the cast for six weeks and has regained full function of his arm despite some continued pain. The victim was approximately six feet, one inch tall and weighed about 205 pounds.

The victim waited until the next day to report the matter to the police because he still "had feelings" for Ms. Tidwell. Investigator Susan Andrews was involved in the investigation of the matter. She noted that the incident occurred on August 28th and was not reported until August 30th, two days after the incident occurred.

Marty Mitchum, a bartender at Bottoms Up, saw the victim on the night of the incident. He recalled that the victim was "aggravated because his ATM card wouldn't work or something, and he kept on trying the ATM machine and was ranting about that and saying . . . he couldn't remember his PIN number or somebody changed his PIN number." He appeared "angry" and mentioned that he was going to talk to Ms. Tidwell about money.

Ms. Tidwell admitted that she had a relationship with the victim that started in high school but that the couple broke up "approximately four to six months" prior to the incident. The victim came to her house twice on the day of the incident. The first time, around noon, he wanted to rekindle the relationship. The victim had been working in Texas for a few months and had just returned to town. Ms. Tidwell denied owing money to the victim and did not let the victim in to her house. She could tell "that he was not happy to find out that [Defendant] was staying there." In fact, she described the victim's behavior as "erratic and loud," even "kicking the door." When she asked him to leave, the victim left her house to go "to the bar." He returned about an hour later, basically repeating the same behavior as before. Ms. Tidwell again asked the victim to leave. In addition to coming to the house, the victim called her "repeatedly" that day, about twenty to twenty-five times. During the day, Ms. Tidwell called Defendant to tell him that she was "scared." Defendant suggested that she leave the house and go to a friend's house.

The victim returned for the final time around 8:00 p.m. He pulled in to the driveway "fast" in his truck, stopping "one and a half" to "two feet" from Defendant's truck. Defendant and Ms. Tidwell were in their "truck leaving to go to Walmart." Ms. Tidwell knew the victim was nearby because she had seen him "making blocks."[1] The victim put his truck in park and jumped out, "almost running" toward Defendant's truck, "hollering at him to get out of the truck." Defendant exited the truck, took out a baseball bat, and asked the victim to get back. The victim was "coming at" Defendant, so Defendant struck the victim in the arm with the baseball bat. Ms. Tidwell got out of the truck "screaming" at the men to quit. Ms. Tidwell claimed that the victim continued to come toward them even after being hit with the bat.

Ms. Tidwell admitted that she never called the police. She later gave a statement to the police as follows:

> Approximately 9 p.m. Friday August 28, [Defendant] and I were pulling out of my driveway in his Dodge truck traveling to Walmart. [The victim] pulled in at the same time to talk with me. As soon as [the victim] parked, [Defendant] grabbed a ball bat and jumped out. He began to holler and he became violent and started swinging the bat as [the victim] struck - - and struck [the victim's] left arm on contact.

Defendant testified that he was working on the day of the incident. Around noon, Ms. Tidwell called him because the victim was trying to kick the door down and was tearing up the back porch. Defendant told her to go to a friend's house. Defendant

---

[1] Ms. Tidwell explained that she saw the victim's vehicle drive around the block and the next road over several times.

arrived home after work around five or six o'clock. He and Ms. Tidwell got ready to leave the house to go to Walmart when it was "plum dark." The victim's truck "[ran] up behind" his truck "right on [his] bumper." The victim got out of the car, "hollering he was going to whoop" Defendant. The victim shouted some "choice words." Defendant, who was five feet, ten inches tall and weighed approximately 180 pounds, was scared. He grabbed a baseball bat that was lying in the back of the truck in the bed. Defendant was not sure how long the bat had been in his truck; he "just looked and there it laid," so he grabbed it. Defendant told the victim to "stop and back up three times" before he "hit him in the side with the bat." Defendant was unsure if he swung first or if the victim swung first. The victim "jumped back up and c[a]me again" toward Defendant. Defendant struck the victim "twice" with the bat, "swinging level, just like you would at a baseball." Defendant was afraid he was going to get hurt because the victim was "coming for [him]." After getting hit by the bat, the victim got in his truck and drove away. Defendant did not report the matter to the police because he "didn't figure [the victim] would be back."

After hearing the evidence, the jury found Defendant guilty of aggravated assault in Count One and guilty of the lesser included offense of assault in Count Two. The trial court merged Count Two into Count One and sentenced Defendant to an effective sentence of three years as a Range I, standard offender.[2] At the hearing on the motion for new trial, Defendant argued that the verdict was contrary to the weight of the evidence. The trial court denied the motion. Defendant appeals.

*Analysis*

On appeal, Defendant argues that there is insufficient proof to support the conviction. Specifically, Defendant argues that the jury was "either irrational or they just didn't understand the instructions" because the "so-called victim" presented "comical" testimony in which he admitted he "was the one instigating the confrontation." Further, Defendant argues that the injury sustained by the victim that "hurt quite a bit" was not akin to "serious bodily injury." The State disagrees.

Well-settled principles guide this Court's review when a defendant challenges the sufficiency of the evidence. A guilty verdict removes the presumption of innocence and

---

[2] According to the proof at the sentencing hearing, Defendant was on parole in Kentucky at the time he committed the crimes at issue herein. Although not noted on the Judgment form (and need not be so noted), the three year sentence imposed herein must mandatorily be aligned consecutively to any portion of the Kentucky sentence not yet fully served. *See* Tenn. R. Crim. P. 32(c)(3)(A). According to Defendant's pre-sentence report, Defendant was convicted on November 30, 2011, in McCracken County, Kentucky, of Schedule II Drugs: Meth, and received a ten year sentence to the Kentucky Department of Correction.

replaces it with a presumption of guilt. *State v. Evans*, 838 S.W.2d 185, 191 (Tenn. 1992). The burden is then shifted to the defendant on appeal to demonstrate why the evidence is insufficient to support the conviction. *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). The relevant question the reviewing court must answer is whether any rational trier of fact could have found the accused guilty of every element of the offense beyond a reasonable doubt. *See* Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). On appeal, "the State is entitled to the strongest legitimate view of the evidence and to all reasonable and legitimate inferences that may be drawn therefrom." *State v. Elkins*, 102 S.W.3d 578, 581 (Tenn. 2003). As such, this Court is precluded from re-weighing or reconsidering the evidence when evaluating the convicting proof, and we may not substitute our own inferences for those drawn by the trier of fact. *State v. Morgan*, 929 S.W.2d 380, 383 (Tenn. Crim. App. 1996); *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Further, questions concerning the credibility of the witnesses and the weight and value to be given to evidence, as well as all factual issues raised by such evidence, are resolved by the trier of fact and not the appellate courts. *State v. Pruett*, 788 S.W.2d 559, 561 (Tenn. 1990). "The standard of review 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *Dorantes*, 331 S.W.3d at 379 (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

For the purposes of this case, an aggravated assault occurs when a person intentionally or knowingly commits an assault as defined in Tennessee Code Annotated section 39-13-101, and the assault results in serious bodily injury to another. T.C.A. § 39-13-102(a)(1)(A)(i). A person commits assault by "[i]ntentionally, knowingly or recklessly [causing] bodily injury to another." T.C.A. § 39-13-101(a)(1). Aggravated assault is a Class C felony. T.C.A. § 39-13-102(e)(1)(A)(ii). Serious bodily injury is defined as "bodily injury that involves: . . . (C) Extreme physical pain; (D) Protracted or obvious disfigurement; [or] (E) Protracted loss or substantial impairment of a function of a bodily member, organ or mental faculty. . . ." The determination of whether an injury is a serious bodily injury is a question of fact for the jury. *State v. Barnes*, 954 S.W.2d 760, 765-66 (Tenn. Crim. App. 1997).

Defendant's brief is replete with complaints and criticisms about the testimony of the various witnesses at trial. Defendant's brief consistently refers to the victim as the "so-called victim," claiming that he "told a whopper" about the events leading up to the confrontation between the two men. Defendant also criticizes Ms. Tidwell's testimony, arguing that it was inconsistent—pointing out that she testified that the victim came to her house both to settle a debt and to attempt reconciliation. These complaints, while colorful and interesting to read, are nothing more than attacks on the credibility of the witnesses. Assessing the quality of witness testimony is not within our purview. *See Pruett*, 788 S.W.2d at 561. So, we will evaluate the evidence presented at trial with the jury's accreditation of the State's witnesses in mind. *See State v. Manning*, 909 S.W.2d

11, 12 (Tenn. Crim. App. 1995) ("A jury verdict approved by the trial judge accredits the state's witnesses and resolves all conflicts in favor of the state.").

Viewing the testimony presented at trial in a light most favorable to the State, the evidence pertaining to Count One showed that Defendant intentionally caused serious bodily injury to the victim by hitting him with a baseball bat which resulted in a broken ulna and dislocated fingers. Defendant admitted as such. The jury clearly did not buy into Defendant's theory of self-defense. From this proof a rational juror could find Defendant knowingly caused serious bodily injury to the victim. Thus, a rational juror could find beyond a reasonable doubt that Defendant was guilty of aggravated assault. Defendant is not entitled to relief on this issue.

*Conclusion*

For the foregoing reasons, the judgment of the trial court is affirmed.

_____
TIMOTHY L. EASTER, JUDGE